**Henry T. DART and the Libertarian Party of Louisiana, Plaintiffs-Appellants,**

v.

**James H. BROWN, Secretary of State for the State of Louisiana, et al., Defendants-Appellees.**

No. 82–3146.

United States Court of Appeals, Fifth Circuit.

Oct. 24, 1983.

Rehearing Denied Dec. 12, 1983.

---

A. Eckert, Staff Atty., New Orleans, La., for State of La.

Ronald P. Nabonne, New Orleans, La., for Lombard.

Before TUTTLE *, POLITZ and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Appellants, Henry T. Dart and the Libertarian Party of Louisiana, brought this suit seeking both injunctive relief and a declaration that certain sections of the Louisiana Election Code were unconstitutional. Finding that the Code sections in question, restricting the notation on the ballot of a candidate's affiliation with an "unrecognized" political party, were constitutional, the district court, following a bench trial, granted judgment for the defendants. We affirm.

On December 18, 1981, Henry T. Dart, a registered member of the Libertarian Party of Louisiana, qualified to run for election to the New Orleans City Council, District B. The preprinted notice of candidacy form, prepared by the office of James Brown, the Secretary of State, contains three boxes concerning party affiliation, one of which the candidate must check. After the phrase, "I am," the candidate must check the box labeled "a member of the Democratic Party," the box labeled "a member of the Republican Party," or the last box, labeled "not affiliated with a recognized political party." Dart checked the box indicating that he was not affiliated with either recognized party (Democratic and Republican), and then typed in "Libertarian Party" next to that box. On December 21, 1981, Edwin Lombard, Clerk of the Criminal District Court for the Parish of Orleans, certified to Brown the candidates qualified for election. Dart was among them.

The certification form which Lombard submitted to Brown listed the political affil-

Henry T. Dart, pro se.

Louis M. Jones, Joseph Giarrusso, Jr., Maureen J. Feran, Asst. Attys. Gen., Paul

* Circuit Judge of the Eleventh Circuit, sitting by designation.

iation of each of the five candidates for the office in question, except Dart, as Democrat. Next to Dart's name was "NP," signifying that Dart was affiliated with no "recognized" party.

Dart wrote to Brown and Lombard on January 4, 1982, and demanded that the designation "Libertarian Party" be placed after his name on the City Council election ballot. Melvin Bellar, Legal Counsel for the Office of the Secretary of State, responded on January 7, 1982, that because the Libertarian Party was not a "recognized political party" as defined in LSA–R.S. 18:441, Brown was not authorized, under LSA–R.S. 18:551 D and E, to print Dart's party designation on the ballot and did not intend to do so.

On January 11, 1982, Dart and the Libertarian Party filed this lawsuit against Brown and Lombard under 42 U.S.C. § 1983.[1] The appellants alleged that LSA–R.S. 18:441, 18:551 D, and 18:551 E violated the First and Fourteenth Amendments to the United States Constitution, and article 1, section 3, of the Louisiana Constitution.[2] Dart and the Libertarian Party sought a declaration that the statutes were unconstitutional, as well as an injunction requiring the appellees to either designate Dart's party affiliation ("Libertarian") on the ballot or remove all candidates' party affiliations from the ballot. By consent of the parties, trial on the merits was consolidated with

the hearing on preliminary injunction, and on January 29, 1982, the district court heard the case. On February 3, 1982, the court entered judgment denying the request for the preliminary injunction and dismissing the suit. In its opinion filed the same day the court held that the Louisiana statutes did not violate the appellants' constitutional rights.[3]

## THE LOUISIANA STATUTORY SCHEME AS APPLIED TO APPELLANTS

It is undisputed that Dart qualified to run in the February 6, 1982 New Orleans City Council "primary" election, and that his name was on the ballot in that election.

That ballot, however, did not designate Dart's political affiliation, although the party affiliation of Dart's four opponents was indicated by the word "Democrat," placed in small type beneath each of their names. The equivalent space under Dart's name on the ballot was left blank. The ballot was prepared in conformity with LSA–R.S. 18:551 D, which provides:

"D. Political party designation. The political party designation of a candidate who is registered as being affiliated with a *recognized* political party shall be printed on the primary or general election ballot on the same line and immediately after or below the candidate's name. *If a*

---

1. Appellee Lombard, Clerk of the Criminal District Court for the Parish of Orleans, asserts that the district court should have granted his Fed.R.Civ.P. 12(b)(6) motion to dismiss the action against him for failure to state a claim upon which relief could be granted. He alleges that because the Secretary of State prepares and certifies the ballots, LSA–R.S. 18:551(A), the Clerk cannot be responsible for their organization and composition. Because Lombard failed, however, to file a cross-appeal on this issue, we are not at liberty to consider it. *Champagne v. Chevron, U.S.A., Inc.*, 605 F.2d 934, 936 (5th Cir.1979).

2. The equal protection clause of the Louisiana Constitution, article 1, section 3, was intended to be a restatement of the equal protection clause of the United States Constitution. Our analysis of the appellants' federal protection claims is similarly applicable to the cause of action stated under the State Constitution.

*Burmaster v. Gravity Drainage District No. 2,* 366 So.2d 1381, 1386 (La.1978).

3. Although this election is history, the case brought by Dart and the Libertarian Party is not moot. Because the Louisiana Election Code will affect candidates and parties in similar situations in future elections, this case presents a controversy "capable of repetition, yet evading review." *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974) (citing *Rosario v. Rockefeller,* 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 1249 n. 5, 36 L.Ed.2d 1 (1973)). *Accord, Anderson v. Celebrezze,* —— U.S. ——, —— n. 3, 103 S.Ct. 1564, 1567 n. 3, 75 L.Ed.2d 547, 554–55 n. 3 (1983). The record does not show the results of the election, although it is evident that the parties have proceeded on the assumption that Dart lost and was not a candidate in any general election for the position.

*candidate is not affiliated with a political party, the space after his name shall be left blank."* (Emphasis added.)

Dart's political affiliation with the Libertarian Party was not placed on the ballot because the Libertarian Party was not then, and is not now, a "recognized" party in Louisiana.

Louisiana schedules elections for different classes or groups of elective offices at different times, but for nearly all such offices, other than presidential elector, there is a "primary" election and, if necessary, also a "general" election. §§ 401, 402, 1251, 1271, 1272. Louisiana has an "open" primary system. The "primary" election is not a device for party nomination. Rather, there is only a single primary election for each office or group of offices, all qualified voters are entitled to vote in it regardless

of their party affiliations, and all qualified candidates are eligible to appear on the ballot, regardless of party endorsement or affiliation. § 401. Apart from general requirements such as age or residence, a candidate qualifies to appear on the primary ballot merely by timely filing a "notice of his candidacy" accompanied by *either* a filing fee *or* a nominating petition.[4] Filing fees range from five hundred dollars for candidates for governor, three and four hundred dollars for other state offices, and lesser amounts for local and municipal offices. § 464.[5] Nominating petitions are to be signed by registered voters in a certain minimum number, ranging from five thousand for all statewide candidates to lesser numbers for other offices. § 465 C.[6] The registered party affiliation, if any, of the voters signing the petition is irrelevant.[7]

---

**4.** Section 461 of the Louisiana Election Code provides:

"A person who desires to become a candidate in a primary election shall qualify as a candidate by timely filing notice of his candidacy, which shall be accompanied either by a nominating petition or by the qualifying fee and any additional fee imposed. A candidate whose notice of candidacy is accompanied by a nominating petition shall not be required to pay any qualifying fee or any additional fee."

Section 463 A provides in part as follows:

"A. (1) *A notice of candidacy* shall be in writing and *shall state* the candidate's name; the office he seeks; the address of his domicile; the parish, ward, and precinct where he is registered to vote, and *the political party, if any, with which he is registered as being affiliated.* The candidate shall designate in the notice the form in which his name shall be printed on the ballot.... [B]ut he shall not designate a deceptive name.... (Emphasis added.)

"(2) The notice of candidacy also shall include a certificate, signed by the candidate, certifying that he has read the notice of his candidacy ... and that all of the statements contained in it are true and correct...."

**5.** Dart qualified by paying the applicable $250 fee. *See* § 464 B(3). Provision is also made for "additional fees," not exceeding one half the amount of the regular filing fee, to be levied, by and for the benefit of the political party desiring to do so, on candidates "affiliated" with that party. § 464 C. Neither the regular filing fee, nor the "additional" fee, is in any way at issue here.

**6.** In Dart's case the number would have been one thousand, the figure applicable to munici-

pal candidates in cities with 300,000 or more residents. § 465 C(4) (fewer signatures are required in less populous cities). Other specified offices and their applicable signature requirements include: Congressman and State Supreme Court Justices, 1,000; Court of Appeal Justices, any officers elected throughout a judicial district, and State Senators, 500; State Representatives and any officers elected throughout a parish, 400; any officer elected throughout a ward, 100. § 465 C(3). Offices not provided require one half of one percent of the number of registered voters in the area from which elected. § 465 C(5). No filing fee or additional filing fee is applicable to candidates qualifying by nominating petition. § 461.

Signatures for nominating petitions for primary elections must be gathered in the 120-day period next preceding the opening of the qualifying period for the candidates. § 465 B. The qualifying period lasts approximately a week, and, depending on the character of the election, closes (or at least did so during the years 1978 through 1982) as little as six or seven weeks, or as much as twelve or thirteen weeks, before the election day. §§ 402, 467, 468. For the February 6, 1982 New Orleans City Council election, the candidate qualifying period closed December 18, 1981. §§ 402 D, 467(4), 468.

The nominating petition requirements are not at issue here.

**7.** Although the nominating petition must state, as to the would-be candidate, "the political party with which he is affiliated, if any," no such information is required as to those signing the petition. § 465 D.

A candidate receiving a majority of the votes cast for the office at the primary election is elected. § 511 A.[8] If no one candidate receives a majority, then the two candidates for the office who received the greatest number of votes at the primary election appear on the subsequent general election ballot, and the candidate who receives the greatest number of votes in the general election is elected. A general election is held for an office only if no one is elected to it as a result of the primary election process, and the only candidates appearing on the general election ballot are those who "survived" the primary. §§ 481, 482, 551 C(2). The "general" election is thus simply a "runoff" election between those receiving the greatest number of votes in a primary election in which no candidate received a majority. On both the primary and general election ballots all candidates for a given office are listed alphabetically by surname in a vertical column headed by the title of the office. § 551 C.[9] Except for the referenced designation of the registered political party affiliation of candidates registered as affiliated with a recognized party, "no information, designation or title shall be printed on the ballot." § 551 E.[10]

Section 441 of the Louisiana Election Code prescribes the requisites for recognition of a political party:

"A political party shall be recognized in this state if one of its candidates for presidential elector received at least five percent of the votes cast in this state for presidential electors in the last presidential election, or if at least five percent of the registered voters in the state are registered as being affiliated with the political party...." [11]

Under Louisiana law there are thus two routes by which a political party may become recognized. Recognition may be achieved under either. One route is for five percent of the State's registered voters to be registered as being affiliated with that party. When a person registers to vote, his or her then declared "political party affiliation," if any, is entered in the voter registration records. §§ 104 A(11), 107 A. Registration to vote occurs at the local parish level and may be accomplished at any time,[12] though it must normally be done in person. §§ 103, 131, 132, 133. "An elector may change his party affiliation by making application therefor in writing to the registrar." § 107 B. It appears this may be done at any time. Voters "may vote on candidates for public office in primary and general elections without regard to the voter's party affiliation or lack of it, and all candidates for public office who qualify for a primary or general election may be voted on without regard to the candidate's party affiliation or lack of it." § 401 B.[13] Just

---

8. Special provision is made for calculation of "majority" when the election is to fill "two or more offices of the same character." § 511 A. And, if at the end of the primary qualifying period no more candidates for an office have qualified than the number of persons to be elected thereto, those so qualifying are declared elected and do not appear on the primary ballot. § 511 B.

9. As a consequence, Dart's name appeared first on the primary ballot's listing of the five candidates for the office of Councilman, District B, City of New Orleans.

10. A minor exception is made respecting candidates having the same surname, in which instance the incumbent, if any, is designated as such, and if there is no incumbent, the address of each is given. § 551 C(1).

11. Section 441 concludes by stating:

"A party which receives more than five percent but less than ten percent of the votes cast in the last presidential election shall not be entitled to representation on a parish board of election supervisors."
This provision is not in issue here.

12. However, only those who have "registered to vote" thirty days or more before an election may vote in it. §§ 521 A, 135 A.

13. However, "candidates for membership on a political party committee may only be voted on by voters who are registered as being affiliated with the same political party as the candidates," and a designation or change of the voter's party affiliation is not effective for such purpose until thirty days after being made. § 521 B. Further, in political party presidential preference primaries (held in April of each presidential year by parties with 40,000 or more registered voters, principally to bind their

when a party must have five percent of the registered voters registered as affiliated with it, in order to be a "recognized" party for purposes of a given election, is not explicitly stated in the statutes. Presumably this status could be achieved as late as the close of the period for candidates to qualify for the election in question. *See* note 6, *supra.*[14]

The other route provided by Louisiana law for political party recognition is that if one of the party's candidates for presidential elector received at least five percent of the votes cast in the State for presidential electors at the last presidential election, the party is "recognized." The candidates for presidential elector selected by each *recognized* political party, and the candidates for president and vice president of such party, are certified by the party to the Louisiana Secretary of State and are automatically placed on the ballot. § 1253. Otherwise, slates of candidates for presidential elector may be placed on the ballot either by a five hundred dollar filing fee, or by a nominating petition signed by five thousand qualified voters,[15] paid to or filed with the Secretary of State during the period from the first Tuesday in August to the first Tuesday in September of the presidential election year. *See* §§ 1254 and 465 C(1). *See also Blanchard v. Brown,* 388 So.2d 865 (La. App. 1st Cir.), *writ denied,* 386 So.2d 919 (La.1980).[16] Apparently, a voter is not disqualified from signing a nominating petition for presidential electors by reason of being registered as affiliated with a different political party.[17] Nominating petitions state the names of the electors, of the candidates for president and vice president whom they support, and, in three words or less, the political principle represented. § 1254(C). The presidential ballot lists the names of the candidates for president and vice president and, in smaller type, the names of the elector candidates, identified as such. § 1259 B. Next to the names of the presidential and vice presidential candidates appear the name and emblem of their political parties, if "recognized", or, "if nominated by a nominating petition, the political principal [*sic*] which the candidates support, as stated on the nominating petition, if any, and the words 'Nominating Petition' . . . ." *Id.* The presidential candidates of recognized parties are listed on the ballot alphabetically, "according to the names of the parties, followed by the names of the candidates nominated by nominating petitions, listed alphabetically by designation of political principal [*sic*]." *Id.*[18]

---

national convention delegates on the first presidential nomination ballot, §§ 1280.21, 1280.27), "no elector may vote . . . for a candidate or slate affiliated with a party in which the elector is not registered." § 1280.25.

**14.** Ballots for primary elections are to be distributed by the Secretary of State twenty-two days before the election. § 552 A.

No complaint has been made respecting the *time* at which the five percent of registered voters alternative test is to be met.

**15.** Five thousand voters would be approximately one quarter of one percent of the 1,942,941 voters who were registered in Louisiana in 1981.

**16.** The filing fee method was apparently that by which the Libertarian Party candidates for president and vice president, and elector, got on the ballot in 1980. *See Blanchard v. Brown, supra.*

**17.** It is unclear whether the 120-day period for collecting signatures applicable to primary election nominating petitions, *see* note 6, *supra,* is also applicable to nominating petitions for presidential electors. In any event, no complaint is made that it is overly difficult for a "minor" party to get its presidential and vice presidential and elector candidates on the ballot.

**18.** It is unclear whether the statement of political principle is listed on the presidential ballot in the instance of candidates not of a recognized party who appear on the ballot by paying a filing fee, rather than by filing a nomination petition.

There is no direct evidence of the format of the 1980 presidential ballot. However, a copy of the Secretary of State's 1980 presidential election proclamation is in evidence; and, if its format is similar to that of the ballot, it suggests that each of the seven presidential (and vice presidential) candidates was listed under his "party" name, the "Democratic Party" being listed in the far left-hand column, the "Republican Party" next, and then, continuing in order to the right: "American Independent Party"; "Citizens Party"; "Independent"; "Libertarian"; and "Socialist Workers Party." Ap-

The testimony and exhibits at trial revealed that the Libertarian Party had not met either of the requisites for recognition. In 1980, the Libertarian Party had run Ed Clark for President of the United States, and he and his vice presidential candidate and supporting electors appeared on the ballot in Louisiana. *See* note 18, *supra*. Had Clark received five percent of the Louisiana presidential vote, the Libertarian Party would have become recognized. According to the 1980 election figures, however, out of 1,548,591 votes cast, Ed Clark received 8,240 votes, or approximately .53 percent of the vote, 4.47 percentage points short of the votes needed for party recognition.[19] Only in one of Louisiana's sixty-four parishes did Clark receive as much as one percent of the total presidential vote, and in that parish (Lafourche) his 326 votes were less than one and one-tenth percent of the total. Only in one parish, Orleans, did he receive as many as 1,000 votes, and there his 1,015 votes were less than six-tenths of one percent of the parish total. The record also reveals that at the time of trial, the roster of the Libertarian Party of Louisiana contained "at a maximum" only 600 names—names of "simply people who are known to us as being interested in the philosophy of the party" and who were "not necessarily registered as Libertarians."[20] In 1981, Louisiana had 1,942,941 registered voters, five percent of which is 97,147 voters. While there was no evidence of the exact amount of Libertarian registration either statewide or in any one parish, it is evident that the Party was not only vastly short of the five percent statewide total, but was also most significantly below that percentage in every parish. Indeed, the Libertarian Party did not claim to have even as much as one percent of the voter registration in any parish.[21]

pellants have made no complaint, here or below, as to the method of the Libertarian Party's listing on the 1980 presidential ballot, or the format of that ballot, or the requirements for appearing thereon.

19. In the 1980 election Ronald Reagan, the Republican candidate, received 792,853 votes, or approximately 51.2 percent of the votes. Jimmy Carter, the Democratic candidate, received 708,453 votes, or approximately 45.7 percent of the votes. John R. Barick, presidential candidate for the American Independent Party, received 10,333 votes, or approximately .67 percent of the votes. Barry Commoner of the Citizen's Party received 1,584 votes, or .1 percent of the total votes cast. Running as an independent, John B. Anderson received 26,345 votes, or approximately 1.7 percent of the votes. And Louisiana voters cast 783 votes, or .05 percent of the votes, for Clifton DeBerry, of the Socialist Workers Party.

20. The witness so testifying, called by the Libertarian Party and a member of its Louisiana State Central Committee, also stated that according to his information "there are approximately 600 Libertarians" in Louisiana.

21. The statewide September 1981 voter registration statistics, broken down by parishes, which the Libertarian Party procured from the Secretary of State's office and offered in evidence, showed total registration, divided into Democrats, Republicans and "other," the latter category including all who registered as affiliated with any party other than Democratic or Republican as well as those who declared no party affiliation. Testimony showed that the local voting registrars kept totals on all the other declared party registrations separately by party, and that the Secretary of State was able to procure this information from the local voting registrars on request, but that the information was not routinely furnished to the Secretary of State. The Director of Voter Registration in the Secretary of State's office testified that he had made a spot check of parishes having in total approximately 600,000 registered voters, and that these had less than one half of one percent registered Libertarians (his testimony is somewhat unclear in that he also stated the total number of Libertarian registrants found in these parishes was, so far as he could remember, "about 80"; 80 would be about thirteen one thousandths of one percent, .00013 expressed as a fraction, of 600,000). Appellants admitted on oral argument that the Libertarian Party's statewide registration did not exceed 600. This would be three one hundredths of one percent, or .0003 expressed as a fraction, of the 1,942,941 total registration.

The statewide "other" registered voter category, reflected by the above-referenced statistics, amounted to 6.07 percent (.0607) of the total registered voters; in only one of Louisiana's sixty-four parishes was it as much as 10 percent (in St. Tammany Parish the 5,778 "other" registrants amounted to 10.7 percent of the total); in forty of the parishes it was less than five percent of the total; Orleans Parish, which had the highest total registration (237,499) likewise had the highest number in the "other" category (16,047, or 6.8 percent).

The Libertarian Party and Dart admit that the Party is not "recognized" under the Louisiana Election Code. They contend, however, that §§ 441 and 551 D and E violate their equal protection rights. In this regard, they challenge as impermissible the distinction Louisiana has made between recognized and nonrecognized parties by requiring the Secretary of State to place on the ballot the registered party affiliation of candidates of recognized political parties, while forbidding placement on the ballot of the party affiliation of all other candidates, including those registered as members of nonrecognized parties. This distinction respecting whether a candidate's party affiliation is listed on the ballot is the only consequence of a party's not being "recognized" of which appellants make any complaint.[22]

## THE STANDARD OF REVIEW

■ The primary error which appellants contend that the district court made was in failing to apply a strict scrutiny test to evaluate the validity of the complained of Louisiana Election Code provisions. The strict scrutiny test requires that the challenged statute be narrowly drawn to provide the least restrictive means of furthering a compelling state interest. We have described it as " 'strict' in theory and usual-

ly 'fatal' in fact." *Arceneaux v. Treen,* 671 F.2d 128, 131 (5th Cir.1982). The application of the test "has been reserved for matters involving race, religion, national origin and characterizations impinging upon 'fundamental rights.' " *Seoane v. Ortho Pharmaceuticals, Inc.,* 660 F.2d 146, 149 (5th Cir.1981) (footnotes omitted) (quoted in *Arceneaux,* 671 F.2d at 131). Dart and the Party urge that the distinction the State has made in allowing only the party affiliations of candidates who are members of recognized parties to be placed on the ballot impermissibly burdens First Amendment rights that the Supreme Court has characterized as fundamental—the right to vote and the freedom of association.

In support of their position that any evaluation of the statutes before the Court calls for the application of strict scrutiny, the appellants cite several Supreme Court decisions concerning election and ballot restrictions, beginning with *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and concluding with *Anderson v. Cele-brezze,* —— U.S. ——, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). *See also Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982); *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230

**22.** Appellants also argue, as they did below, that the State has made it impossible for the Libertarian Party to achieve five percent voter registration because the registrars refuse the requests of Libertarian voter registrants to indicate their party affiliation on the registration records. The only evidence offered in support of this claim was the testimony of the witness Brisbin who stated that this had once happened to him when he registered to vote, at an unspecified time, in Jefferson Parish. There is no evidence that this incident was ever reported to anyone. This witness also testified that "other members of the Libertarian Party ... had the same experience," but he did not say how many were involved or when or where the incidents occurred or whether they were ever reported; he then admitted he was not present at any such incident involving any other voter registrant, and was only repeating what he had been told, and the district court thereupon properly ruled this aspect of Brisbin's testimony was inadmissible hearsay. The State Director of Voter Registration, Bruder, testified he never heard of any such incident as related

by Brisbin, that voters were not barred nor in any way restricted from registering as affiliated with the Libertarian Party and that he knew of no activities by election officials which could impede State recognition of the Libertarian Party. It is evident from the district court's opinion that it credited Bruder's testimony, and its decision to do so is not clearly erroneous. Fed.R.Civ.P. 52(a). Moreover, Brisbin's single claimed experience in Jefferson Parish, occurring at some unspecified time and not shown to have been reported to anyone, is obviously an insufficient basis on which to strike down the Louisiana statutory scheme for recognition of political parties, assuming that scheme is otherwise valid. Nor does such an incident serve as a basis for setting aside the 1982 New Orleans City Council election. Moreover, appellants did not request any character of injunctive (or other) relief against any Jefferson Parish officials to require them to comply with the Louisiana Election Code, under the terms of which any eligible voters desiring to do so are clearly entitled to be registered as affiliated with the Libertarian Party.

(1979); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *American Party v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

We reject appellants' contentions and hold that the strict scrutiny test is inapplicable. In the first place, a fundamental distinction exists between this case and all the cited Supreme Court decisions. In each of the cases before the Supreme Court the state had prevented the names of the candidates from even appearing on the ballot—candidate *ballot access* was absolutely denied. In *Anderson* the Supreme Court identified two "basic constitutional rights," —— U.S. at ——, 103 S.Ct. at 1568–69, 75 L.Ed.2d at 556, burdened by ballot restrictions—"[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates" and "[t]he exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views ... and a candidate serves as a rallying-point for like-minded citizens." *Id.* —— U.S. at ——, 103 S.Ct. at 1569, 75 L.Ed.2d at 557 (footnote omitted). Neither interest is invaded in a case of this kind—the voters had a full choice of candidates, including Dart, and candidate Dart was available as a rallying point and campaign focus for Libertarians and other like-minded citizens.

Dart seems to recognize that the State did not restrict his access to the ballot. Instead, he and the Libertarian Party argue that the Party was denied access to the ballot, and hence application of the strict scrutiny test promulgated in the ballot access cases is mandated here.

We reject this argument. Although the Supreme Court's ballot access cases have discussed, in part, the access of new political parties to the ballot, the restrictions under consideration described as denying access to the parties have always concurrently denied access to the parties' candidates.

The candidate is a vehicle for a party. He or she represents the ideals of a group of persons and is, once elected, the person whom members of the group expect to implement their political ideals and work toward their political goals. If it had no candidate to offer, a political party would neither seek nor gain access to the ballot. The Libertarian Party here offered its candidate, Henry Dart, whom it supported for City Council. Although the words "Libertarian Party" did not appear under Dart's name, the Libertarian Party was not denied access to the ballot. The ballot's only significance was in electing candidates. It was a candidate, not a party, ballot. Any ballot slot to which the Libertarian Party might have been entitled would have been granted to it through its candidate, Dart. As Dart was granted access to the ballot, so was the Libertarian Party.

When a new party and its candidate are denied access to the ballot, the party members are denied the right to cast their votes for the candidate whom they support. Because Dart was on the ballot, his supporters could vote for him. Their fundamental right to cast their votes effectively was not impaired. Similarly, Libertarian Party members and Dart's other supporters retained their freedom to associate for the advancement of their political beliefs, with candidate Dart, and his campaign, available as a rallying point.

A major goal of a political party is to elect a candidate who will further the party's values and fortunes in the political arena. When a party's candidate is on the ballot, the party members' acts of associating and campaigning for a candidate who will advance their political beliefs are worthwhile. The candidate's placement on the ballot is a requisite for the party members to achieve their goal of having their political thoughts implemented. If elected, the candidate, as a participant in government, will be able to translate the party members' political beliefs into political action. If the party has no candidate on the

ballot, the members' acts of political association can be individually enriching, but cannot directly serve the tangible end of securing a representative voice in government.

Since Dart was on the ballot, any political associating which Libertarian Party members and Dart's supporters did was directly related to furthering a fundamental party and political purpose—to get their candidate, Dart, elected. The members were "wholly free to associate, to proselytize, to speak, to write, and to organize campaigns" in support of their candidate and their political views. *Jenness,* 403 U.S. at 438, 91 S.Ct. at 1974. The claim that the freedom of association of the Libertarian Party members was significantly burdened cannot be sustained.

We recognize that our rejection of the strict scrutiny test under these circumstances may be ultimately inconsistent with the approach taken by the Eighth Circuit in *McLain v. Meier,* 637 F.2d 1159 (8th Cir. 1980). There, strict scrutiny was apparently applied to strike down North Dakota laws requiring a petition with signatures of 15,000 registered voters, approximately 3.3 percent of the state total, to be filed ninety days before the primary and 150 days before the general election in order for the candidate of a party which did not receive five percent of the vote at the last gubernatorial general election to be placed on the general election ballot.[23] In *McLain* the candidate plaintiff ultimately qualified as an independent, and accordingly in fact appeared on the ballot, but the Court disregarded this circumstance, stating:

"We decline to find, as the State urges, that the early filing deadline for third *party* candidates is offset by a later filing deadline for independent candidates. A candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process. As the Supreme Court has recognized, 'the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.' *Storer v. Brown, supra,* 415 U.S. at 745, 94 S.Ct. at 1286." *Id.* at 1165 (footnote omitted).

However, unlike the California and North Dakota election laws at issue in *Storer* and *McLain,* Louisiana does not provide different methods of ballot access for candidates depending on their party affiliation or independent status, nor do any candidates[24] run as "nominees" of any parties. To secure a place on the ballot, Dart had to do nothing not required of any other candidate, and was certainly not "compelled to adopt independent status."

In *Storer,* California, replying to the assertion that the ballot access requirements for independent candidates were overly burdensome, contended that an independent candidate could nevertheless secure a place on the ballot by forming a new political party, meeting what were claimed to be the less difficult level of support requirements applicable in such instance, and running as its nominee. It was in rejecting this con-

---

**23.** The ultimate result in *McLain* is not necessarily at variance with that reached here, as the substantive analysis in *McLain* focused on the combination of the early petition filing deadline and the "relatively high signature requirement," *id.* at 1164, and stressed "the importance of the interplay between the statutory signature requirement and the filing deadline . . . ." *Id.* at 1169. Indeed, the Court noted "that a relatively high signature requirement may be constitutionally acceptable when coupled with an opportunity to approach voters for signatures at a date less remote from the general election. . . ." *Id.* Here, no timing complaint is made in respect to the five percent of registered voter alternative. In regard to the five percent of votes at the last presidential

election alternative, while such a requirement might prove a timing problem in a case like *McLain* (where the party in question was not formed until the summer of 1978 and the election in question was November 1978), here the Libertarian Party fielded candidates for President and Vice President in November 1980, and no claim is made of any substantial relevant change between that time and the applicable December 1981 qualification period. Further, *McLain* also found discrimination against minor party candidates in ballot position, *id.* at 1165–67, which is not present here.

**24.** Other than presidential electors, as to whom no complaint is made.

tention that *Storer* employed the language relied on by *McLain*. The *Storer* opinion went on to point out in this connection that not only would the new party route entail "undertaking the serious responsibilities of qualified party status ... such as the conduct of a primary, holding party conventions, and the promulgation of party platforms," but that it would also in effect require of the candidate, and his supporters, "sacrificing" or "surrendering" their "independent status." 415 U.S. at 745–46, 94 S.Ct. at 1286. The associational rights of the independent candidate and his supporters would be violated by forcing them to form and act as a party, when the very essence of their political philosophy might be antithetical to political parties as such. No comparable situation is present under Louisiana law. Lack of designation of a candidate's party affiliation on the Louisiana ballot does not designate the candidate as an independent or as anything other than a candidate who has not registered his affiliation with a political party which has either as many as five percent of the State's registered voters or whose presidential candidate received at least five percent of the vote at the last presidential election. Louisiana requires no "flying under false colors."

The *McLain* Court premised its application of the strict scrutiny test on the fact that the North Dakota statutes at issue restricted the "fundamental right to vote [which] is inseparable from the right to place the candidate of one's choice on the ballot." *Id.* at 1163. However, as we have observed, the members of the Libertarian Party, and other supporters of Dart, *were* able to exercise their right to vote for him and he *was* on the ballot. There was no denial of the right to have the candidate of one's choice on the ballot or to vote for such candidate.

We have observed that the Supreme Court decisions in this general area all deal with situations where the complaining candidates have been denied access to the ballot, while the case before us does not involve such a denial, and is hence less suitable for application of the strict scrutiny test. However, even in cases where the challenged restrictions prevent the candidate from appearing on the ballot, it is by no means clear that the Supreme Court has uniformly applied a strict scrutiny test.

Where the restrictions burden not only candidate ballot access but also other important constitutionally protected rights, application of the strict scrutiny test seems clearest. This is illustrated by the filing fee cases of *Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (results of large filing fees "would fall more heavily on the less affluent ... whose favorites may be unable to pay the large costs required ..."), and *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974) (filing fees cannot be a requirement for indigent candidates; "qualifying candidates ... may not constitutionally be measured solely in dollars"). Another illustration is provided by cases where the ballot access requirements are geographically discriminatory. *See, e.g., Moore v. Ogilvie*, 394 U.S. 814, 819, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969) (invalidating nominating petition requirement which "discriminates against the residents of the most populous counties of the State in favor of rural sections"). Similar considerations seem to have been influential in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), where the Court was faced with an Illinois requirement that for independent or "new" party candidates to appear on a statewide ballot a nominating petition with 25,000 signatures was necessary, but for such candidates to appear on a municipal ballot the number of signatures required was five percent of the number voting in the most recent municipal election. The five percent figure produced a total less than 25,000 everywhere except in Chicago and Cook County, where it required some 35,000 signatures. Noting that the state's "interest in avoiding overloaded ballots in statewide elections is served by the 25,000 signature requirement" and that the state "has advanced no reason, much less a compelling one, why the State needs a more stringent

requirement for Chicago," *id.* at 186, 99 S.Ct. at 991, the Court held the election code "unconstitutional insofar as it requires independent candidates and new political parties to obtain more than 25,000 signatures in Chicago." *Id.* at 187, 99 S.Ct. at 991.

Other ballot access cases are less clear as to the standard applied, especially in regard to the least restrictive means prong of the strict scrutiny test. In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court struck down Ohio's complex set of ballot access requirements as applied to presidential elections. These made no provision for independent candidates or write-in votes, required a new party to obtain signatures of fifteen percent of those voting in the preceding gubernatorial election by a very early date, and imposed numerous other burdensome and detailed organizational procedures, including the holding of a primary election conforming to rigorous standards. These requirements were so restrictive that the American Independent Party candidates were unable to qualify despite having garnered signatures (over 450,000) well in excess of the fifteen percent requirement. The Court held that these provisions, "taken as a whole," imposed undue burdens on the fundamental voting and associational rights of individuals not favoring major party candidates and hence were invidiously discriminatory and violative of the equal protection clause. *Id.* at 34, 89 S.Ct. at 12. However, doubtless because the combined effect of the Ohio laws was plainly so far in excess of what was necessary or appropriate to further the state's legitimate and compelling interests, the Court's opinion does not clearly indicate that the *only* valid regulations in this area are those imposing the *least* restrictive requirements *necessary* to the satisfaction of such interests.

In *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court upheld Georgia laws providing that independent candidates, and candidates of political parties whose candidate in the last presidential or gubernatorial election received less than twenty percent of the votes cast,

could be placed on the general election ballot only by submitting, by the deadline for candidates to file for the major party primaries, petitions signed during the preceding 180 days by a number of eligible voters not less than five percent of those who were "*eligible* to vote in the last election" for the office being sought. *Id.* at 433, 91 S.Ct. at 1972 (emphasis added). The Court held there was "an important state interest in requiring some preliminary showing of a significant modicum of support" before granting ballot access, "the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process . . . ." *Id.* at 442, 91 S.Ct. at 1976. Nothing in Justice Stewart's opinion for the Court, expressing the views of seven Justices (Justices Black and Harlan concurred in the result), suggests application of the strict scrutiny test. It is especially noteworthy that the Court, though plainly aware that the five percent of those eligible to vote requirement was higher than comparable requirements in nearly every other state (*id.* at 442 & n. 28, 91 S.Ct. at 1976 & n. 28), nevertheless did not appear to consider whether the state's interests might not be adequately served by a lesser percentage.

In *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), and *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), the Court primarily focused on the level of support requirements which minor party or independent candidates had to meet in order to appear on the ballot. In *American Party* the Texas requirements in this regard were upheld. In *Storer* the California requirements were held not to be facially invalid, but remand was ordered for factual determination as to whether the brief period (twenty-four days) allowed for signature gathering, coupled with the provision that those who voted in any of the preceding primaries were ineligible to sign the necessary nominating petitions, rendered invalid the requirement that the nominating petitions be signed by five percent of the total votes cast in the last general election, as

being more than "a reasonably diligent independent candidate [could] be expected to satisfy." *Id.* at 742, 94 S.Ct. at 1285.[25] Although there is some language in these decisions indicating application of the strict scrutiny test, we believe Professor Tribe fairly characterizes these two opinions as a whole in stating that:

"... each actually assayed the requirements by a far less demanding standard. In particular, the Court in several instances did not inquire whether a less restrictive alternative would adequately protect the state's interests .... The standard of review actually applied, therefore, seems to have been a mix of strict and minimal scrutiny." L. Tribe, *American Constitutional Law* (1978), 783.

We also observe that in *Storer* the Court noted there was "no litmus-paper test" in this area and that "[d]ecision in this context, as in others, is very much a 'matter of degree.'" *Id.* at 730, 94 S.Ct. at 1279. It seems to us that these remarks are particularly apt as applied to determination of the validity of a requirement for a given level of support. Since *Jenness, Storer,* and *American Party,* as well as other decisions,[26] clearly establish the constitutionality of conditioning ballot access on a preliminary showing of a substantial modicum of popular support, the validity of such requirements, absent any peculiarly invidious feature, will usually present a "how much" rather than a "whether" question. This sort of question, it seems to us, is particularly ill-suited for mechanical application of the strict scrutiny test, especially its least restrictive means prong. If three percent of the registered voters is the challenged standard, the state will be hard put to defend the proposition that the difference between that figure and 2.7 percent is vital to its interests. By the same token, however, it cannot be denied that the interest in assurance of popular support is *not* "served equally well" (*American Party,* 415 U.S. at 781, 94 S.Ct. at 1306, emphasis added) by 2.7 percent as by three percent.

In the most recent of the Supreme Court's ballot access decisions, *Anderson v. Celebrezze,* —— U.S. ——, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court invalidated, as too early, Ohio's March 20, 1980 filing deadline for independent presidential candidates. The Court was divided five to four, and the majority placed heavy emphasis on the strong national, and diminished state, interest in presidential elections. *Id.* —— U.S. at ——, ——, ——, 103 S.Ct. at 1572, 1577, 1579, 75 L.Ed.2d at 561, 567, 569. The opinion contains language suggesting that generally applicable, evenhanded measures restricting ballot access to candidates making a preliminary showing of substantial support are not "constitutionally-suspect." *Id.* —— U.S. at —— & n. 9, 103 S.Ct. at 1569 & n. 9, 75 L.Ed.2d at 557 & n. 9. This, in turn, appears to militate against application of the strict scrutiny test to measures of that particular variety. Moreover, in articulating overall standards for review of alleged unconstitutionally restrictive election regulations generally, the Court did not expressly invoke the strict scrutiny test. Rather, it directed that there first be considered "the character and magnitude of the asserted injury" to constitutionally protected rights; the next step was to "identify and evaluate the precise interests" of the state asserted as justifications

---

**25.** While this language might imply that the requirement would be unconstitutional if there were *any* reasonably diligent candidate who could not meet it, we agree with Professor Tribe that such is an incorrect reading: "The rest of the Storer opinion, however, leaves no doubt that the Court is referring to a reasonably diligent candidate who has a fair amount of popular support." L. Tribe, *American Constitutional Law* (1978), 783 n. 33. This is further confirmed by the statement in *American Party,* of which Justice White was also the author, that "... what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties *with significant support* from the ballot." 415 U.S. at 783, 94 S.Ct. at 1307 (emphasis added).

**26.** *See, e.g., Illinois State Board of Elections v. Socialist Workers Party, supra; Jackson v. Ogilvie,* 325 F.Supp. 864 (N.D.Ill.), *aff'd mem,* 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971); *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977).

for the burdens imposed by its rule, determining "the legitimacy and strength of each" such interest and "the extent to which those interests make it necessary to burden the plaintiff's rights." Finally, decision was to be reached "[o]nly after *weighing all* these factors." *Id.* —— U.S. at ——, 103 S.Ct. at 1570, 75 L.Ed.2d at 558 (emphasis added). However, the Court noted that "[t]he results of this evaluation will not be automatic; as we have recognized, there is 'no substitute for the hard judgments that must be made.'" *Id.* (quoting *Storer*).

We conclude from these decisions that the strict scrutiny test is likely *not* applicable in determining whether a given level of popular support, required by the state as a condition of candidate ballot access, is too high to meet constitutional standards. We note that the Tenth Circuit appears to have reached essentially the same conclusion in *Arutunoff v. Oklahoma State Election Bd.,* 687 F.2d 1375, 1380 (10th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). For the reasons previously stated, if the strict scrutiny test is likely inapplicable to such a requirement where it operates to deny a candidate any access to the ballot, then it would seem evident that it would be inapplicable where the requirement does not deny ballot access at all but only designation of candidate party affiliation. *See also Mathers v. Morris,* 515 F.Supp. 931, 935–38 (D.Md.), *aff'd,* 649 F.2d 280 (4th Cir.) (per curiam), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

Concluding that the strict scrutiny test is inapplicable, we will attempt to apply the "weighing" process suggested in *Anderson,* recognizing, with it, that the "evaluation" is not automatic and that there is no substitute for the hard judgments that must be made. Though we agree that, particularly in this area, "each case must be resolved on its own facts," *Arutunoff,* 687 F.2d at 1379, nevertheless, as an inferior court, our "weighing" and "evaluation" must necessarily be informed by the substantive results in analogous decisions of the Supreme Court.

## APPLICATION OF THE STANDARD

■ We are first enjoined to consider the "character and magnitude" of the asserted injury to appellants' constitutional rights. Putting this inquiry in slightly different terms, which we believe have the same substantive meaning but provide a more convenient framework for our analysis in this particular case: How high is the hill which appellants are asked to climb, and what sort of asserted injuries to their rights ensue if they are unable to climb it?

We initially consider the sort of injury which ensues. The rights in question under the First Amendment are to cast a meaningful vote for a candidate of one's choice and to meaningfully associate for the advancement of political beliefs. *Anderson,* —— U.S. at ——, 103 S.Ct. at 1569, 75 L.Ed.2d at 557. Under the equal protection clause there is also the right not to be subjected to invidious or irrational discrimination in respect to these interests. *Williams.* Here, any injury to any of these rights is minor, indirect and remote. As previously discussed, Libertarians and other supporters of Dart had full opportunity to vote for him, and to have their vote counted equally, and Dart's candidacy was available as a rallying point for like-minded citizens. Further, the ballot's omission of the designation "Libertarian" by Dart's name, while listing "Democrat" by the name of each of his four opponents, resulted not from any invidious or irrational discrimination, but rather from neutral criteria of general and evenhanded application, criteria which *Jenness* and related decisions indisputably establish are rationally and legitimately related to distinctions which the state may make between political parties in its "recognition" or treatment of them. *See Bullock,* 405 U.S. at 147, 92 S.Ct. at 858 ("distinguishing between political parties on the basis of success in prior elections" is permissible); *Anderson,* —— U.S. at —— n. 9, 103 S.Ct. at 1570 n. 9, 75 L.Ed.2d at 557 n. 9.

Perhaps the inability of a candidate affiliated with a "minor" party to have the ballot designate his party affiliation, while

the respective party affiliations of candidates affiliated with "major" parties do appear on the ballot, diminishes the former's chances of success in any given election. If this were true to any really significant extent, the lack of party designation *might* arguably be said to impair the ability to cast a *meaningful* vote, or to *meaningfully* associate for the enhancement of political beliefs. But the truth of such a proposition is by no means self-evident, and there is no evidence in this record, and appellants point to no recognized literature or facts of common knowledge, so demonstrating. The 1980 presidential election results in Louisiana (*see* note 19, *supra*), in which apparently Anderson ran simply as an "Independent" and the four "minor" and two "major" party candidates ran under their respective party names (*see* note 18, *supra*), do not so suggest, as Anderson had the third highest vote total, with well over twice the vote of the highest "minor" party candidate. It is certainly not obvious that designation of affiliation with a party that has been unable to register as many as five percent of the registered voters will be helpful to a candidate. Moreover, except in presidential elections, the Louisiana ballot designation of a candidate's party affiliation does *not* indicate that the candidate has been selected by or has the support of that party or any of its members (other than the candidate). Hence, the "undesignated" candidate is not labeled as lacking all organizational support or as having less than any other candidate. And the ballot is not structured as a race between parties which the "minor" parties are not allowed to enter. It is a candidate ballot, the only significance of which is the election of individual candidates, not party nominees as such. Perhaps over a period of time a "minor" party would benefit from the "exposure" attendant to having its name appear on the ballot, but this is wholly speculative. The effect might be just the opposite, as with the perennially losing candidate. The Court observed in *Anderson* that *every* electoral regulation "inevitably affects—at least to some degree—the individ-

ual's right to vote and his right to associate with others for political ends," but plainly implied that this factor alone did not constitute a regulation or burden "constitutionally-suspect." —— U.S. at ——, 103 S.Ct. at 1569, 75 L.Ed.2d at 557. We conclude that any injury to the Libertarian Party members' ability to effectively vote and associate for political purposes, arising from the Party's failure to be "recognized" under Louisiana law, is at most indirect, attenuated and slight.

Is the hill appellants have been asked to climb too high? Since, as we have noted, the decisions of the Supreme Court clearly recognize that a state may properly condition party ballot recognition on "some preliminary showing of a significant modicum of support," *Jenness* 403 U.S. at 442, 91 S.Ct. at 1976, this question becomes essentially one of degree. Louisiana allows "recognition" on the basis of either five percent of the vote cast at the last presidential election or registered affiliation of not less than five percent of total registration. Support at the level of five percent of total registration would not appear to be excessive, as that was the figure sustained in *Jenness*. No subsequent decision of the Supreme Court has questioned the soundness of this holding in *Jenness,* and *Jenness* has been cited with approval in regard to its "some preliminary showing of a significant modicum of support" holding in a host of subsequent Supreme Court ballot access cases. *See Bullock,* 405 U.S. at 147, 92 S.Ct. at 858; *Storer,* 415 U.S. at 738, 94 S.Ct. at 1283; *American Party,* 415 U.S. at 782 n. 14, 789, 94 S.Ct. at 1307 n. 14, 1310; *Illinois State Board of Elections,* 440 U.S. at 185, 99 S.Ct. at 990; *Anderson,* —— U.S. at —— n. 9, 103 S.Ct. at 1570 n. 9, 75 L.Ed.2d at 557 n. 9. *See also Lubin,* 415 U.S. at 718–19, 94 S.Ct. at 1320–21; *Clements,* 457 U.S. at 965, 102 S.Ct. at 2844, 73 L.Ed.2d at 517. Indeed, no Supreme Court decision has invalidated a ballot access requirement solely or even primarily on the ground that the required level of support—in terms of number or percentage of the vote or voters—

was excessive.[27] Rather, the critical focus seems to have been mainly on the provisions related to *how* the required level of support had to be demonstrated, such as the length of time allowed to collect signatures, the time at which the level of support had to be demonstrated, what citizens could be counted for that purpose, and the like. *See e.g., Moore v. Ogilvie, supra; Illinois State Board of Elections, supra; Mandel v. Bradley, supra; Storer, supra.* We recognize there are intimations in *Storer,* 415 U.S. at 739, 94 S.Ct. at 1283, that the *Jenness* level of support requirements may approach the maximum permissible for exclusion of candidates from the ballot. *See also* L. Tribe, *American Constitutional Law* (1978), 784 (". . . requirements as high as five percent are not unconstitutional per se, but requirements substantially in excess of five percent probably are" (footnote omitted)). But here, the five percentage figure, whether applied to those voting in the last presidential election or to registered voters, is not greater than that approved in *Jenness* (five percent of those *eligible* to vote in the last election), and we hold that, of itself, it is not excessive.[28] We are unable to find Louisiana constitutionally at fault for using five percent, instead of three percent or one percent, for purposes of its statutory scheme.

Appellants, however, also contend that the Louisiana recognition requirements are overly stringent in respects other than simply requiring too high a percentage level of support.

In this connection, appellants initially contend that both of the Louisiana recognition alternatives—that based on the previous presidential vote and that based on registered voters—are excessive because they are measured against statewide totals although their application is not confined to statewide elections, but extends to purely local elections as well, such as the municipal election in which Dart was a candidate. This, of course, was not the situation in *Jenness,* where the five percent standard was applied against the number eligible to vote in the last election for the particular office in question. As an abstract matter, we recognize there is considerable force in this particular contention of appellants, and much can be said for the proposition that Louisiana would be well advised to allow each of its five percent standards to be satisfied in the particular area where the election as to which a party desires to be "recognized" is held. Under such a system, if the Libertarian Party had polled five percent of the 1980 presidential vote cast in the New Orleans City Council, District B area, or if by December 1981 five percent of the registered voters in the New Orleans City Council, District B area were registered as Libertarians, then Dart would have been entitled to have "Libertarian" placed under his name on the ballot for the February 1982 New Orleans City Council, District B "primary" election. However, we decline to determine in this case whether Louisiana is constitutionally required to provide such a "localized" alternative to its standards for party "recognition." The evidence is quite clear that appellants would not in *any* parish come remotely close to meeting even a two percent requirement—whether applied to presidential vote or voter registration— and they do not contend otherwise, or that

---

**27.** We do not regard *Williams* as being to the contrary. There, the focus was clearly on the totality of the barriers. Indeed, in *Williams* the American Independent Party met the fifteen percent of the vote in the previous election requirement (which would be equivalent to about eight percent of registered voters, if 53 percent of those registered voted).

**28.** While the evidence shows that only the Democratic and Republican Parties, and, some years ago, the States Rights Party, have met the Louisiana requirements for "recognition," there is no showing of the effort in this regard,

if any, made by any other party, or that any "unrecognized" party had ever demonstrated in *any* manner, whether by the vote received by candidates it supported, its number of registered voters, petitions, claimed membership or otherwise, any significant measure of popular support. *See* note 25, *supra.* The highest "minor" party level support which the record shows is the two thirds of one percent vote received by the American Party in the 1980 presidential election (John Anderson, running as an Independent, received 1.7 percent). *See* note 19, *supra.*

the Louisiana Libertarian Party would so much as approach qualification for "recognition," in New Orleans City Council, District B or anywhere else, under a "localization" of the Louisiana party recognition standards. Accordingly, although we do not pass on the abstract merits of appellants' contentions in this regard we do decline to reverse the judgment of the district court on any such basis. *See Storer,* 415 U.S. at 734, 94 S.Ct. at 1281 ("... neither Storer nor Frommhagen is in position to complain that the waiting period is one year, for each of them was affiliated with a qualified party no more than six months prior to the primary"); *Broadrick v. Oklahoma,* 413 U.S. 601, 609–16, 93 S.Ct. 2908, 2914–18, 37 L.Ed.2d 830 (1973); *Arutunoff,* 687 F.2d at 1380.

The Libertarian Party and Dart also attack the presidential vote alternative of Louisiana's party recognition requirements because it presents an insuperable barrier to any political party, no matter how great its popular support, which is either formed after the most recent presidential election or exists exclusively for the purpose of participating in State politics. However, the Libertarian Party fits neither of these classifications. It was formed well prior to the 1980 election and ran presidential and vice presidential candidates in that election who appeared on the ballot in Louisiana. Appellants do not contend, and none of the evidence suggests, that the Party, its purposes, level of support or relevant circumstances have materially changed since then, or that there is any reason to believe that it is prejudiced by these particular aspects of the presidential vote alternative. It would thus appear that appellants are in no position to complain of these asserted defects in the presidential vote alternative. Further, in any event the registered voter alternative remains available.

Appellants assert, however, that the registered voter alternative is overly burdensome because it is too difficult to persuade voters to change their registration. They point out that in *Jenness* the requirement was for petitions, not registration. We are not persuaded. Party affiliation registration or change thereof is not a burdensome procedure under Louisiana law, and it may be accomplished at any time. There are no limits on how frequently one may change registered party affiliation, nor any minimum time which must elapse between changes. Registered party affiliation does not affect the right to vote or run in any election[29] or to sign nominating petitions for candidates. There is no evidence that procuring the requisite number of party registrants is significantly more difficult than procuring a like number of signatures of registered voters on a petition requesting party recognition. We observe that in *Jenness* all the signatures on the petitions had to have been executed within the six months next preceding the candidate filing deadline for the primaries. No such limitation on the length of time utilized to procure the requisite number of registered party affiliates exists under Louisiana law.

Appellants rely in this connection on *N.C. Socialist Workers Party v. N.C. State Board of Elections,* 538 F.Supp. 864 (E.D.N.C. 1982), where the court held invalid a North Carolina ballot petition provision for minor party candidates requiring the petition to recite that those signing thereby directed that they be registered as affiliated with the party in question. The provision concerning registration was relatively new, and unrebutted evidence showed that while the plaintiff Socialist Workers Party had had no difficulty in meeting the petition requirements before the provision concerning its effect on the signer's registered affiliation came into force, thereafter the Party was "completely stymied" because of the resistance on the part of potential signers engendered by the new provision. No remotely comparable evidence exists in this case. Nor are we informed of the effects on a voter which North Carolina law attaches to his or her registered party affilia-

**29.** Except that one may not vote or run in an election for *party* (not governmental) offices or vote in a party's presidential preference primary unless one is registered as affiliated with that party thirty days before the election in question. *See* note 13, *supra.*

tion.[30] More significantly, under the North Carolina system, the petitions were a means of *ballot access* for the *candidates.* Thus a voter was, in effect, required to join the Socialist Workers Party in order to be given the opportunity to vote for one of its candidates. As the court explained: "The restrictive effect is particularly serious in the case of the unaffiliated voter, one who desires to join no party . . . . [The provision burdens] the ability to vote effectively of persons who wish to consider the Party's candidates but do not wish to join the Party." *N.C. Socialist Workers Party,* 538 F.Supp. at 866. In Louisiana there is no such burden, for Louisiana's requirements, unlike those of North Carolina, do not restrict which candidate appears on the ballot, and unlike his North Carolina counterpart the Louisiana voter who is interested in voting for the candidate, but not in joining the party, has full opportunity to so vote, regardless of how many register as affiliated with the party. In Louisiana, it is only those who want to assure that the *party name,* in addition to the desired candidate, appears on the ballot, who need be concerned with whether the *party* has sufficient registrants. It does not seem unreasonable for Louisiana to provide that *such* concern be manifested by registered party affiliation.

Accordingly, we conclude that, as applied to appellants, the burdens placed upon them to avoid the asserted injuries to their rights are not excessive or unreasonably difficult, particularly in light of the relatively minor, remote and attenuated nature of the asserted injuries themselves. More simply put, the "character and magnitude" of the asserted injury is not severe, quantitatively or qualitatively.

We turn now to consideration of the State's interest asserted as justification for the "burdens" imposed on appellants. This interest is readily identified, namely the interest in avoiding "confusion" or "deception" in ballot content. The legitimacy and strength of this interest has been recognized in numerous decisions of the Supreme Court. *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976; *Bullock,* 405 U.S. at 145, 92 S.Ct. at 857 (interest in avoiding "voter confusion"); *Lubin,* 415 U.S. at 715, 94 S.Ct. at 1319 (interest in keeping ballots "understandable" is "of the highest order"); *Storer,* 415 U.S. at 732, 94 S.Ct. at 1280 (quoting *Jenness*). While the particular ballot confusion or deception addressed in those cases was that which might arise from an excessive number of candidates appearing on the ballot, it appears obvious that those decisions rest on the broader principle that the state had a strong and legitimate interest in minimizing ballot-engendered voter confusion or deception generally, regardless of what it is about the ballot that causes it to have that potential.

It is evident that if candidate political "party" affiliation is to be designated on the ballot, the potential exists for voter confusion or deception unless there are some restrictions on what constitutes a political "party" for these purposes. A political party implies a relatively numerous group of people, associated together for common political purposes, with some sort of organization actively functioning in the political arena. For the state's ballot to represent that a candidate is affiliated with a particular political party, when in fact there is no such party in the commonly understood sense of the word, has the obvious potential for causing voter deception and confusion. Moreover, the quality and quantity of information actually imparted to voters by the designation of candidate

---

**30.** It may be, for example, that in certain areas of North Carolina the Democratic primary was, in practical effect, the election, and that voting in such primary was restricted to those registered as Democrats. Voters who may have desired a minor party candidate to appear on the ballot for a particular statewide office might have been reluctant to sign such a petition out of fear that by doing so they might be effectively prevented from voting in the only "real" election, the Democratic primary, for local offices (though they could change their registration back, this would require extra effort, would appear to render their petition signature false and might present timing problems). Nothing comparable exists under the Louisiana system.

party affiliation will to a significant extent vary with the degree to which the designated party is known to the voters, and a reasonable method by which to gauge such voter knowledge is the level of support which the party has achieved among the electorate. Indeed, no practical and equally effective alternative gauge suggests itself. Finally, just as an unrestricted proliferation of candidate names on the ballot may engender confusion or deception, so may an unrestricted proliferation of party names. And, requiring some preliminary showing of a significant modicum of support for a party before a candidate's affiliation with it is designated on the ballot is necessary to further the state's strong and legitimate interest in minimizing ballot confusion and deception in the same way as requiring such a showing respecting a candidate, before his name is listed on the ballot, is necessary to further such interests.[31]

Appellants suggest there is no need to have any party designation on the ballot, and that it is unimportant because the ballot's party designation does not imply any endorsement or support by the named party. · We reject these contentions. Louisiana

allows almost unrestricted candidate access to the ballot. While this openness subserves the interests which the First Amendment is designed to foster, it likewise, as the previously cited decisions recognize, has more of a tendency to produce voter confusion or deception than does a system which restricts candidates to those who have made some preliminary showing of a significant modicum of support. Some information about candidate affiliation with a party which has demonstrated a significant modicum of support will mitigate this tendency to greater voter confusion or deception which is the inevitable consequence of Louisiana's otherwise First Amendment enhancing "open" ballot. Further, the fact that Louisiana's electoral scheme gives no formal or structural significance to party nomination or endorsement tends to increase, rather than decrease, the need for *some* ballot information concerning party affiliation. But that party-related ballot information need not be so open ended or unrestricted as to itself engender confusion or deception.[32] And, nothing in the Constitution forces Louisiana to choose between giv-

---

**31.** We recognize that on presidential election ballots Louisiana has allowed designation of the party nominating the presidential candidate without requiring any significant showing of support for that party. *See* notes 15, 16 and 18, *supra*, and accompanying text. We do not consider that Louisiana is thereby obliged to apply the same scheme to the rest of its elections. The State may well have chosen the system it did for presidential voting to achieve greater uniformity with other states in such a truly national contest. This is certainly a legitimate consideration. *See Anderson,* —— U.S. at ——, ——, ——, 103 S.Ct. at 1572, 1577, 1579, 75 L.Ed.2d at 561, 567, 569. Additionally, the party of a presidential nominee might have significant support elsewhere in the nation, though not in Louisiana, the relevance of such out-of-state support for the candidate's party is obviously far greater in presidential than in state elections, and Louisiana voters would be more likely in presidential than in state elections to familiarize themselves with a party having significant support only out of state. The difficulty of measuring such out-of-state support for any given party may have influenced Louisiana in its decision to impose no significant level of support requirements for party name designation on the presidential ballot. Finally, Louisiana's presidential ballot—

like that of most other states—is organized by parties. The portion of the ballot applicable to the presidential race consists only of party nominees and independents. In that circumstance, Louisiana may reasonably have felt it more appropriate to list the party name, even though the party had not demonstrated significant support, and more prejudicial to the party and candidate to refuse to do so, than in the case of Louisiana's other elections where no candidate appears on the ballot as or by virtue of being a party nominee.

**32.** Appellants also suggest that a designation of political beliefs would serve any needed informational function as well as party affiliation, while avoiding any necessity to provide standards to party "recognition." We disagree. Ballot space and the time for a voter to consider what he or she sees on the ballot are necessarily severely limited. The simple reference to an existing political party which actually has significant public support carries far greater potential for imparting much more, and more accurate and relevant, information than does the potentially infinite variety of self-serving descriptions of political beliefs by which candidates might choose to describe themselves.

ing parties no recognition whatsoever or, on the other hand, giving them the major role in the formal electoral process that most other states do. Moreover, the less "importance" which is assigned to the ballot designation of candidate party affiliation, the less "prejudice" to appellants on account of the Libertarian Party not meeting the support qualifications required to be listed on the ballot as the "Party" with which a candidate is affiliated.

Weighing and evaluating the character and magnitude of the asserted injury to those interests of appellants which the First Amendment is designed to foster, the strength and legitimacy of Louisiana's interest asserted in justification of the burdens imposed, and the extent to which those interests necessitate such impositions, we conclude that the Louisiana statutes in question do not violate appellants' constitutional rights under either the First Amendment or the equal protection clause. Louisiana's standards for party recognition are high, indeed close to, or perhaps even marginally beyond, those which might be judged permissible were the consequences of failing to meet them significantly more severe, such as denial of candidate ballot access. But the consequences are not severe, and appellants' ability to exercise and enjoy their rights under the First Amendment are neither clearly, directly, nor significantly impaired. Though Louisiana treats the Libertarian Party differently from some other parties, it does so solely on the basis of neutral, evenhanded criteria of general applicability. It is not required to treat "things that are different as though they were exactly alike." *Jenness,* 403 U.S. at 442, 91 S.Ct. at 1976; *Anderson,* —— U.S. at ——, 103 S.Ct. at 1576, 75 L.Ed.2d at 565. These criteria and the treatment resulting from their application are reasonably calculated and important to the furtherance of strong and legitimate interests of the State. We do not suggest that Louisiana's electoral system would inevitably collapse in near total confusion and deception if its ballot did not designate any candidate's party affiliation, or if its requirements for ballot designation of candidate party affiliation were sufficiently lowered so that the Libertarian Party would qualify. However, we fail to perceive any significant injury to, or invidious treatment of, appellants under the Louisiana system. Louisiana has acted fairly to materially further, though perhaps not to a great degree, its strong and legitimate interests in reducing the potential for voter confusion and deception which its ballot might otherwise tend to engender. As applied to appellants, we find the Louisiana provisions in question to be constitutional. The judgment of the trial court is therefore affirmed.

AFFIRMED.