Joseph F. DEVINE, John M. Carlevale, and Anthony Almonte, Plaintiffs,

US PAC, a political action committee and association in and through its President, Bruce Lang, and Treasurer, Steven Richards, Daniel J. Grych, Arthur Os-terhout, Robert F. Plante, Scott J. Grych, Jonathan Bell, Warren A. Pizik, Domenic Perillo, Michael M. Young, Hugh D. Auchincloss, Clifford M. Carl-son, Richard Brochu, Patricia Ann Pi-mental, Charles Clifton Cox III, Richard H. Patenaude, Carolyn Randell, Joseph Cross, Charles Nelson, Robert Bailey, Vilma Zanni and Mark A. Cote, Plain-tiff Intervenors,

v.

STATE OF RHODE ISLAND and Provi-dence Plantations, Kathleen S. Connell, Personally and in her Capacity as Secre-tary of State, and Joseph R. Distephano, Personally and in his capacity as Chair-man of the Rhode Island Board of Elec-tions, Defendants.

Civ. A. No. 92–0580–P.

United States District Court, D. Rhode Island.

July 14, 1993.

Joseph F. Devine, pro se.

John M. Carlevale, pro se.

Anthony Almonte, pro se.

Arlene Marie Violet, Arlene Violet & Law Assoc., Barrington, RI, for intervenor plaintiffs.

Thomas A. Palombo, R.I. Atty. Gen.'s Office, Providence, RI, for defendants State of Rhode Island and Joseph DiStephano.

Amato A. DeLuca, Mandell, Goodman, DeLuca & Schwartz, Providence, RI, for defendant Kathleen Connell.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

In this action, brought pursuant to 42 U.S.C. § 1983, plaintiffs challenge the constitutionality of Rhode Island's ballot configuration process. Plaintiffs, proceeding *pro se*, are three former independent candidates for statewide office in Rhode Island. Under the banner of "Reform '92," they sought to obtain the five percent (5%) of the popular vote necessary to establish a third "recognized" political party pursuant to R.I.G.L. § 17–1–2(f).[1] Plaintiff intervenor US PAC is a political action committee and association representing its members and the named individual plaintiff intervenors, who are all former independent candidates for state and local offices.[2]

Plaintiffs claim that defendants—the State of Rhode Island and former Secretary of State, Kathleen Connell (collectively "defendants" or "the State")[3]—violated their First

---

1. R.I.G.L. § 17–1–2(f) defines "political party" as follows:

   "Political party" or "party" shall mean any political organization which at the preceding general election nominated a candidate for governor, and whose candidate for governor at the election polled at least five percent (5%) of the entire vote cast in the state for governor
   . . .

2. Plaintiff intervenors have not participated in any of the post-election proceedings in this case. Their interest in obtaining further relief, however, is identical to that of the plaintiffs.

3. Because the Original Complaint in this matter named only the State of Rhode Island and Providence Plantations and Kathleen S. Connell, Secretary of State, as defendants in this action, defendants move to dismiss the Complaint as against Kathleen Connell in her individual capacity and Joseph DiStephano, personally and in his capacity as Chairman of the Rhode Island Board of Elections. While *pro se* plaintiffs cannot be held to the same standards of pleading as experienced attorneys, *see Serrano v. Gonzalez*, 909 F.2d 8, 14 (1st Cir.1990) (*pro se* pleadings are to be liberally construed, in favor of the *pro se* party), there is no evidence in the record to support any claims against Connell, personally, or against DiStephano, personally, or in his capacity as Chairman of the Rhode Island Board of Elections. Those claims are therefore DISMISSED.

and Fourteenth Amendment rights of political association and equal protection by publishing and distributing, to over 438,000 registered households in Rhode Island, two official Sample Ballots that listed their names in a column below the bold heading "INDEPENDENTS FOR LaROUCHE." [4] Plaintiffs also claim that despite defendants' implementation of corrective measures, the discrepancy between the configuration of the official Sample Ballots and the ballots actually used on election day caused voter confusion so extensive as to undermine the fairness and outcome of the election.

This Court's first contact with the case occurred on October 30, 1992, when it considered plaintiffs' and plaintiff intervenors' motions for a temporary restraining order ("TRO") enjoining the November 1992 general election. In a Memorandum and Order issued immediately following an emergency hearing, this Court found that plaintiffs and plaintiff intervenors had met the standards for injunctive relief.[5] While declining to enjoin the upcoming election, the Court attempted to fashion appropriate relief in light of the short time period left before the polls opened on election day, November 3, 1992. In full consultation with the parties, the Court directed defendants to print and distribute to each voter on election day a true copy of the ballot as it would appear at each polling place, along with a disclaimer explaining the discrepancy between the official Sample Ballots and the actual ballot.

In the November 1992 general election, plaintiff Devine, the Reform '92 candidate for Governor, did not obtain the necessary 5% of the vote to establish Reform '92 as a third "recognized" political party. Disappointed with the election results and upset over alleged non-compliance with the Court's October 30, 1992 Order, plaintiffs now seek further relief. They argue that in light of defendants' non-compliance, this Court must set aside the election, or, in the alternative, issue an Order recognizing "Reform '92" as a new "political party." In addition, plaintiffs seek an Order adjudging defendants in contempt of Court. Finally, plaintiffs move to amend their complaint in order to challenge the constitutionality of a litany of Rhode Island's election statutes.

In light of the vital public interests at stake and the thorny issues of constitutional law presented, I provide detailed factual findings.

## I. FINDINGS OF FACT

### A. The Reform '92 Campaign [6]

Plaintiffs Devine, Carlevale, and Almonte are part of a larger group of reform-minded citizens who cast their energies and resources together in an effort to establish a third political party in Rhode Island under the banner of "Reform '92." Sensing a degree of dissatisfaction in the general public with "business as usual," and voters' willingness to consider alternative third party candidacies such as presidential candidate Ross Perot, they undertook to provide Rhode Islanders with a choice at the polls. This choice reflected not simply an individual third party candidate, but a coordinated effort, including the organization of a Reform '92 political convention, the development of a comprehensive political platform, and the fielding of three candidates for statewide offices.

Throughout 1992, plaintiffs and their supporters engaged in the traditional activities associated with political campaigns. They held fundraisers, canvassed door-to-door, attended community events, and delivered speeches. They also sought to communicate their coordinated message through various instruments of the press, including newspapers and the popular "talk radio" format.

---

4. At the time, Lyndon LaRouche, a convicted felon and perennial candidate for President, was conducting his campaign from a federal prison in Rochester, Minn. *THE 1992 CAMPAIGN: For Those Not Satisfied With a 3–Man Race*, N.Y. Times, October 25, 1992, § 1, at 25.

5. A copy of the Court's October 30, 1992 Memorandum and Order is attached at Appendix A.

6. Because plaintiff intervenors presented no testimony apart from that of their counsel, Arlene Violet, at the October 30, 1992 emergency hearing, I focus my findings of fact upon Reform '92 plaintiffs and their supporters.

After months of activity, plaintiffs were apparently on their way to achieving their desired goal of establishing a third party. Polls and newspaper accounts, according to plaintiffs, showed plaintiff Devine obtaining 8–10% of the popular vote as of late-summer/early-fall of 1992, well in excess of the 5% statewide vote needed to establish a third party under R.I.G.L. § 17–1–2(f).

In early October 1992, the Secretary of State's elections division authorized and coordinated the printing of two Sample Ballots for the 1992 general election, to be distributed as part of an official Rhode Island "Voter Information/State Referenda" pamphlet. At the bottom of each official Sample Ballot, written in bold capital letters, were the words: **"YES! YOU MAY TAKE THIS SAMPLE BALLOT INTO THE VOTING BOOTH!"** The pamphlet and Sample Ballots were mailed to approximately 438,000 registered households in Rhode Island.[7]

The Secretary of State's elections division prepared the official Sample Ballots in accordance with state election laws and following past practice, as indicated in an informal elections manual containing a two-page memo entitled **"GUIDELINES FOR BALLOT LAYOUT."** (Def.Ex. B) ("Guidelines").[8] These Guidelines contain brief general rules for ballot layouts in primary and general elections, with special instructions as to the placement of candidates for local races.

In accordance with the Guidelines, defendants configured the Sample Ballots as follows: The offices to be elected were listed top to bottom in the first column on the left, beginning with President, Representative in Congress, Governor, Lieutenant Governor, Secretary of State, Attorney General, General Treasurer, and then local state senators and representatives.[9] The next two columns to the right were labelled with bold headings bearing the names of the two officially recognized state political parties: "DEMOCRAT" and "REPUBLICAN." By tradition, the first party column was given to the party represented by the Secretary of State, in this case DEMOCRAT, and the second one to the REPUBLICAN party.

Because 1992 was a presidential election year, the remaining candidate columns (3 through 8) were labelled with bold headings, alphabetically, stating the name of the independent presidential party with which each independent presidential candidate claimed affiliation on their nominating papers. Under this arrangement, the third column was labelled with the bold heading "INDEPENDENTS FOR LaROUCHE," the fourth with "LIBERTARIAN PARTY," the fifth with "NATURAL LAW PARTY," the sixth with "NEW ALLIANCE PARTY," the seventh with "PEROT FOR PRESIDENT," and the eighth with "TAXPAYERS PARTY." Although none of these so-called "independent presidential parties" constituted officially "recognized" parties under R.I.G.L. § 17–1–2(f), the independent presidential and vice-presidential candidates were listed below each of the above column headings, according to their party affiliation. The democratic and republican presidential and vice-presidential candidates were listed directly below the column headings designating "DEMOCRAT" and "REPUBLICAN," respectively.

Next, candidates from the officially "recognized" parties (i.e., Democrats and Republicans) who were running for offices other than president were listed vertically below the presidential and vice-presidential candidates in their respective columns. Independent candidates for offices other than president, however, including plaintiff candidates for Governor, Secretary of State, and Attorney General, were listed alphabetically by last name and horizontally across the page.

The result of the above configuration was that plaintiff Reform '92 candidates, by virtue of their alphabetical listings, were all

---

7. Copies of the Sample Ballots from the voter information pamphlet are attached at Appendix B.

8. A copy of these Guidelines is attached at Appendix C.

9. There was no listing for U.S. Senate, as that seat was not on the ballot in the November 1992 general election. In addition, no local candidate names appeared on the Sample Ballots as distributed in the official Voter Information pamphlet.

placed in the column headed in large bold print with the completely unaffiliated independent presidential party label "INDEPENDENTS FOR LaROUCHE." While the label "Reform '92" appeared in small italics and in parentheses above the name of each Reform '92 candidate, the inescapable visual effect was a direct association between the plaintiff Reform '92 candidates and "INDEPENDENTS FOR LaROUCHE." [10]

After the Sample Ballots and Voter Information pamphlets were distributed, plaintiffs received numerous inquiries from supporters and the press questioning Reform '92's affiliation with "INDEPENDENTS FOR LaROUCHE." According to plaintiffs, the popularity and serious media attention Reform '92 once enjoyed began quickly to evaporate. Plaintiffs were also concerned that voters not be misled by the ballot configuration and they raised these concerns with the Secretary of State. In addition, the Rhode Island Chapter of the American Civil Liberties Union raised similar concerns with the Secretary of State over the treatment of third party candidates on the ballot.

After protracted negotiations, the Secretary of State agreed to alter the configuration of the ballots as they would appear on election day by placing stickers labelled "INDEPENDENT" across the row of column headings reserved for the independent presidential parties. Thus, the top row of headings on the ballot then read: DEMOCRAT, REPUBLICAN, INDEPENDENT, INDEPENDENT, etc., instead of DEMOCRAT, REPUBLICAN, INDEPENDENTS FOR LaROUCHE, LIBERTARIAN PARTY, NATURAL LAW PARTY, etc. The State sent out notice by means of letter and newspaper advertisements as to the problem and the changes that were to be made.

Despite defendants' corrective efforts, plaintiffs believed that the confusion generated by the Voter Information pamphlets, the discrepancy between the number of Sample Ballots mailed and the circulation of the newspaper notices, and the media reports questioning plaintiffs' affiliation with the LaRouche political organization, severely damaged the credibility of Reform '92 at a crucial stage in the campaign. With the election imminent, they filed the present action.

### B. The Emergency Hearing

As noted above, this Court held an emergency hearing on Friday, October 30, 1992, to consider plaintiffs' Complaint and TRO motion.[11] Immediately thereafter, I issued a written Memorandum and Order in which I declined to enjoin the upcoming election. I specifically found, however, that the Sample Ballots mailed to over 438,000 households in Rhode Island "inherently create[d] such confusion as to restrict the voters' right to vote freely for the candidate of their choice." Memorandum and Order at 3. Based upon this finding, I ordered defendants to provide voters on election day with an accurate facsimile of the ballot as it would appear in the voting booth, and to apprise voters by means of a disclaimer, as to the discrepancies between the official information booklet and the actual ballot.

In the November 1992 general election, a total of 424,818 votes were cast in the gubernatorial race. Plaintiff Devine, the Reform '92 candidate for Governor, received 14,511 votes or 3.41% of the total vote. Pursuant to R.I.G.L. § 17–1–2(f), as noted above, plaintiff Devine needed another 6,729 or 1.59% of the vote for Reform '92 to become a recognized political party.

### C. Post–Election Motions

In April and May of 1993, the Court heard evidence in support of the plaintiffs' motions to set aside the election and to adjudge defendants in contempt. Plaintiffs presented a total of twenty-eight witnesses and fourteen exhibits. The Court heard testimony from registered voters; Reform '92 campaign workers; two radio talk show hosts; officials

---

10. Other independent candidates for state offices, such as Norman Jacques, a candidate for Representative in Congress, also found themselves placed in columns headed by independent presidential parties unaffiliated with their candidacies. In the case of Mr. Jacques, he appeared in the column headed "LIBERTARIAN."

11. The Court also considered and granted the motion of plaintiff intervenor US PAC, a political action committee and association representing voters and independent candidates for state and local offices, to intervene in the action.

from the Secretary of State's elections division; the former Secretary of State—Kathleen Connell; the present Secretary of State—Barbara Leonard; the Chairman of the Board of Elections—Joseph DiStephano; a representative from S & A/Paramount Printing Co. ("S & A") of Lincoln, RI—the printer of the court-ordered sample ballots and disclaimers; and the three plaintiff Reform '92 candidates themselves.

Defendants presented a total of four exhibits and three witnesses: Sharon M. DiSpirito—the Director of Elections at the Office of the Secretary of State; Janet L. Armstrong—the Executive Secretary/Office Manager at the Board of Elections; and Chairman DiStephano.

The uncontested testimony of plaintiffs' witnesses revealed that substantial numbers of voters never received the court-ordered sample ballot or disclaimer. In several polling places, boxes of sample ballots and disclaimers lay unopened in a corner on the floor, or under registration tables, throughout much of the early morning wave of voter turnout. Many voters who received the hand-outs were not instructed as to the significance of the items. In addition, many wardens and poll workers had no idea why the boxes of sample ballots and disclaimers had been delivered to the polling places.

Several witnesses testified that the Reform '92 headquarters received hundreds of calls on election day registering complaints that the court-ordered sample ballots and disclaimers were not being distributed. At least two talk radio shows during the day received numerous calls from listeners claiming not to have received the materials. In addition, the Rhode Island Board of Elections and the Secretary of State's elections division each received dozens of phone calls complaining about the hand-outs.

With respect to the appearance of the court-ordered sample ballots, testimony re-

vealed that on Friday, October 30, 1992, the printer, S & A, experimented with different sizes of paper and inquired into the availability from local paper suppliers of paper sizes in sufficient quantities to comply with the Order. The printer determined that the only size paper available in sufficient quantities was 8½ by 14 inches. The sample ballot, however, when reduced to 8½ by 14 inches, contains typeface that is barely legible to the average reader. Specifically, the "individually designated affiliations" listed above the names of the plaintiffs, as referred to in the Order, were illegible to the average reader.[12]

Testimony further revealed that notwithstanding the illegibility of the typeface on the sample ballot, representatives of the Secretary of State's elections division authorized the reproduction of in excess of 300 different sample ballots, along with accompanying disclaimers, generating a total number of pages in excess of 1 million at a cost in excess of $50,000 to the State. At no time did those responsible for carrying out the Court's Order make any effort to consult the Court, the plaintiffs, or legal counsel as to whether the illegible sample ballot was consistent with the Order.

Finally, former Secretary of State, defendant Kathleen M. Connell, stated that she never directly supervised the preparation and distribution of the court-ordered sample ballot or the disclaimer. Nor did she ever personally view and/or approve the sample ballots or disclaimers before the printing began. By her own admission, she did not even see a copy of the court-ordered sample ballot or disclaimer until she went to vote on election day. (Tr., May 26, 1993, at 85–86).

Defendants' witnesses testified as follows: On October 30, 1992, during and after the emergency hearing, representatives of the Secretary of State, at the direction of the Secretary of State, were coordinating with S & A to print a new sample ballot.[13] Over the

---

12. Ideally, I would have appended an example of one of the Court-ordered sample ballots to this opinion. Since reduction of the actual ballots to 8½ by 14 inches rendered them largely illegible, however, a reduction to 8½ by 11 inches for publication would be meaningless. Nevertheless, a single copy of one of the sample ballots

may be found with the records of this case as Plaintiffs' Exhibit # 5.

13. According to defendants, S & A was selected because it is the only printer in the State with the capability to print ballots and because of its longstanding working relationship with the Secretary of State's office.

weekend of October 31–November 1, 1992, the Secretary of State did, in fact, direct S & A to reproduce a sample ballot for each district on 8½ by 14 inch paper. The paper size was selected based upon paper availability and time constraints. The legibility problem, according to defendants' witnesses, was created by plaintiffs' insistence that the entire ballot for each district be reproduced, including all state and local ballot questions, rather than simply a corrected copy of the Sample Ballot contained in the official Voter Information pamphlet.

Over the weekend of October 31–November 1, 1992, the Secretary of State did, in fact, direct S & A to produce a disclaimer in accordance with the October 30, 1992 Court Order, and to reproduce such disclaimer in numbers sufficient to accompany the new sample ballots.

On Friday, October 30, 1992, Chairman DiStephano and his staff prepared a sheet of instructions directed to all bi-partisan supervisors and wardens, explaining that the sample ballots and disclaimers would have to be handed out to each voter at the polls.[14] This instruction sheet was delivered to S & A and was taped to the cover of each box of sample ballots and disclaimers to be distributed to the polling places.

On Friday, October 30, 1992, representatives of the Secretary of State contracted with a courier service to deliver the boxes of sample ballots and disclaimers to each of the 39 local boards of canvassers throughout the State. In excess of 1,000 boxes were delivered to various boards of canvassers throughout the day on Monday, November 2, 1992.

Representatives from both the Secretary of State's elections division and the Board of Elections telephoned each of the 39 local boards of canvassers to inform them of the Court's Order and of the arrival of the packages of sample ballots and disclaimers. The local boards of canvassers were told to distribute these packages of materials to each

polling place, along with the rest of their election materials. A total of approximately 590 polling places were to receive packages of sample ballots and disclaimers.

On election day, starting at 9:30 a.m., the Board of Elections attempted to contact each board of canvassers to remind them to ensure that their local wardens and poll workers were distributing the sample ballots and disclaimers. Because there were over 4,000 poll workers employed by the local boards of canvassers on election day, it was impossible to instruct each worker as to the significance of the sample ballots and disclaimers. Defendants apparently believed that word would get to them by means of the instruction sheet and through verbal instructions from the local boards of canvassers. All three of defendants' direct witnesses testified that they believed the defendants made every effort humanly possible to carry out the Court's October 30, 1992 Order.

## II. DISCUSSION

At the initial emergency hearing of this matter, I expressed my concern over the time pressure involved in issuing the Court's original Memorandum and Order. At that time, I also reserved the right to clarify and further develop the legal reasoning in that Memorandum. While I recognize that the focus of the post-election hearings was plaintiffs' motions to set aside the election and to adjudge the defendants in contempt, I have decided to take this opportunity to make explicit findings as to the constitutionality of Rhode Island's ballot configuration process.[15]

### A. First Amendment

The right to vote is the wellspring from which many other cherished rights flow in our representative democracy. As the Supreme Court has stated: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."

---

**14.** A copy of the instruction sheet is attached at Appendix D.

**15.** With respect to these findings, I note that the underlying facts, as presented at the October 30,

1992 emergency hearing and as developed through testimony at the post-election hearings, are undisputed.

*Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964); *see also Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886) (right to vote regarded as fundamental right because it preserves all other rights); *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) ("[A]ny restrictions on that right [to vote] strike at the heart of representative government.").

■ The Supreme Court has also recognized that, despite the fundamental nature of this right, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). The State's broad power to regulate the franchise, however, "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986).

This case concerns the effect of Rhode Island's ballot configuration procedures on the rights of plaintiffs and their supporters.[16] "An election ballot is a State-devised form through which candidates and voters are required to express themselves at the climactic moment of choice." *Rosen v. Brown,* 970 F.2d 169, 175 (6th Cir.1992) (quoting *Bachrach v. Secretary of Commonwealth,* 382 Mass. 268, 415 N.E.2d 832, 834 (1981)). *See also Anderson v. Martin,* 375 U.S. 399, 402, 84 S.Ct. 454, 455–56, 11 L.Ed.2d 430 (1964). "The ballot is necessarily short; it does not allow for narrative statements by candidates and requires responses by the electors simple enough to be counted." *Rosen,* 970 F.2d at 175 (citing *Bachrach,* 415 N.E.2d at 834–35). "Within these limitations, a State has discretion in prescribing the particular makeup of the ballot for its various elections; however, this discretion must be exercised in

subordination to relevant constitutional guaranties." *Id.* (citing *Bachrach,* 415 N.E.2d at 835).

This case does not present the typical "ballot access" scenario in which candidates and their supporters challenge election laws or practices that unduly restrict or deny them *access* to a place on the ballot. *See, e.g., Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (challenging Ohio's early filing deadline for independent presidential candidates); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (challenging, among other things, California statutes denying ballot position to independent candidates if they voted in the immediately preceding primary or if they had a registered affiliation with a qualified political party at any time within one year prior to the immediately preceding primary); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (challenging, among other things, Ohio's requirement that a new party obtain petitions signed by qualified electors totalling 15% of the number of ballots cast in the preceding gubernatorial election). Indeed, plaintiffs' names appeared on both the official Sample Ballots and the actual ballot.

Nor does this case raise the typical issues found in actions to set aside elections due to irregularities or ballot illegality so egregious as to effect the outcome of any individual contest. *See Griffin v. Burns,* 431 F.Supp. 1361 (D.R.I.1977), *aff'd,* 570 F.2d 1065 (1st Cir.1978) (challenging outcome of local election where absentee and shut-in ballots were retroactively disqualified); *Navedo v. Acevedo,* 752 F.Supp. 523 (D.P.R.1990), *aff'd,* 932 F.2d 94 (1st Cir.1991) (challenging outcome of mayoral election based upon irregularities and problems at polling places). Plaintiffs never expected to be "winners" in the conventional sense. Their focus was to garner enough votes to obtain the 5% needed to establish an official third party.

**16.** While the direct impact of Rhode Island's challenged ballot configuration practices falls upon independent candidates for state and local offices, the Supreme Court has recognized that " 'the rights of voters and the rights of candidates do not lend themselves to neat separation;

laws that affect candidates always have at least some theoretical, correlative effect on voters.' " *Anderson v. Celebrezze,* 460 U.S. 780, 786, 103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983) (quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)).

■ This case is similar, however, to two recent decisions involving challenges to statutes regulating the *appearance* of state ballots: *Dart v. Brown,* 717 F.2d 1491 (5th Cir.1983), *cert. denied,* 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984), and *Rosen v. Brown, supra.* These cases provide strong support for the proposition that states must take great care in configuring the ballot—particularly when granting space for "voting cues" such as descriptive information on a candidate's party affiliation or political philosophy.

In *Dart,* the Fifth Circuit upheld a Louisiana statute which permitted the political party affiliation of "recognized" party candidates to be printed on the ballot next to their name but required the space to be left blank for candidates not affiliated with recognized political parties. Plaintiff Dart's political party affiliation, Libertarian, was not placed on the ballot because the Libertarian Party was not a recognized political party in Louisiana.

In analyzing the statute, the Fifth Circuit reviewed extensively the Supreme Court's ballot access decisions. It noted that even in cases where complaining candidates and their supporters were denied access to the ballot altogether, the Supreme Court has not uniformly applied strict scrutiny. *Dart,* 717 F.2d at 1501–03 (citing *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), and *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974)). The Fifth Circuit ultimately rejected traditional strict scrutiny analysis in favor of the balancing test set forth by the Supreme Court in *Anderson v. Celebrezze, supra:*

[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789, 103 S.Ct. at 1570.[17] The Fifth Circuit upheld the statute at issue because it did not *prevent* Dart from having his name placed on the ballot. The court concluded that any injury to the First and Fourteenth Amendment rights of Dart's supporters was minor, indirect, and remote since they had full opportunity to vote for him and have their vote counted.

The Fifth Circuit noted in dicta, however, that the First Amendment protects the right to cast a meaningful vote for a candidate of one's choice and to associate for the advancement of political beliefs. *Dart,* 717 F.2d at 1504. The Court further stated that if it were true to a significant extent that the lack of a party designation impairs the ability to cast a meaningful vote or to associate, it might reach a different result. *Id.* at 1505. The Fifth Circuit found, however, that no such evidence appeared in the record before it. *Id.*

**17.** In developing this balancing test, the *Anderson* Court reiterated that questions presented by restrictions on ballot access "cannot be resolved by any 'litmus-paper test.'" 460 U.S. at 789, 103 S.Ct. at 1570 (quoting *Storer,* 415 U.S. at 730, 94 S.Ct. at 1279). While the *Anderson* analytical framework involves a "weighing of factors," at least one court has commented that it "essentially retain[s] the individual components of the strict scrutiny calculus ..." *Greidinger v. Davis,* 988 F.2d 1344, 1351 (4th Cir. 1993).

In a more recent ballot access case, *Norman v. Reed,* — U.S. —, —, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992), the Supreme Court returned to a more straightforward strict scrutiny test, stating: "To the degree that a state would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify this limitation, and we have accordingly required *any severe restriction* to be narrowly drawn to advance a state interest of compelling importance." (emphasis added) (citations omitted). Thus, it appears that "severe restrictions" on ballot access may still invoke traditional strict scrutiny analysis.

In *Rosen v. Brown, supra,* the Sixth Circuit considered an Ohio statute strikingly similar to the one at issue in *Dart.* The statute prohibited any "words, designations, or emblems descriptive of a candidate or his political affiliation" to be printed under or after a non-recognized party candidate's name on the ballot. Seizing upon the Fifth Circuit's lack of a factual record indicating that the absence of a party designation impaired the ability to cast a meaningful vote or to associate, the Sixth Circuit distinguished *Dart* and invalidated the statute.

The *Rosen* court first noted that "[w]ith respect to the political designation of the candidates on nomination papers or on the ballot, a State could wash its hands of such business and leave it to the educational efforts of the candidates themselves, or their sponsors, during the campaigns." 970 F.2d at 175 (citing *Bachrach,* 415 N.E.2d at 835).

> Once a State admits a particular subject to the ballot and commences to manipulate the content or to legislate what shall and shall not appear, it must take into account the provisions of the Federal and State Constitutions regarding freedom of speech and association, together with the provisions assuring equal protection of the laws.

*Id.* (citing *Bachrach,* 415 N.E.2d at 835).

The Sixth Circuit agreed with the *Dart* court's conclusion that the *Anderson* balancing test was the correct standard by which to measure the constitutionality of the challenged statute. Applying the *Anderson* test, the Sixth Circuit found that "the State infringes upon the right of supporters of Independent candidates to meaningfully vote and meaningfully associate by providing a 'voting cue' to Democratic and Republican candidates which makes it virtually impossible for Independent candidates to prevail in the general election." 970 F.2d at 176. After analyzing and rejecting as "specious" the State's asserted "strong and compelling interest" in minimizing ballot-generated voter confusion and in producing a manageable ballot, the court concluded that the state statute violated the First Amendment and the Equal Protection clause of the Fourteenth Amendment.

The Sixth Circuit relied heavily upon the affidavit testimony of three expert witnesses in reaching its conclusion. According to the court:

> [T]he available evidence indicates that it does make a difference that some candidates have symbols after their names on the ballot while others do not. Voting studies conducted since 1940 indicated that party identification is the single most important influence on political opinions and voting. Almost two-thirds of the electorate has some form of party loyalty, and the tendency to vote according to party loyalty increases as the voter moves down the ballot to lesser known candidates seeking lesser known offices at the state and local level. Without a designation next to an Independent's name on the ballot, the voter has no clue as to what the candidate stands for.
>
> \* \* \* \* \* \*
>
> [T]he denial of a ballot designation to Independent candidates causes substantial prejudice .... ... Ohio's ballot scheme is the equivalent of putting an unlabeled product on a shelf next to brand name products in a supermarket. Consumers would not choose the unlabeled product, because they have been conditioned by advertising to perceive quality in brand name products. Similarly, the absence of a label for a candidate gives rise to mistrust and negative inferences.

*Rosen,* 970 F.2d at 172–73.

The Sixth Circuit's finding that the failure to provide a "voting cue" to independent candidates burdens the First Amendment rights of independent candidates and their supporters, applies with equal force to the case at hand. If such a disparity between the labelling of recognized party candidates and independents amounts to a deprivation of constitutional dimension, then the potential *mislabelling* of candidate affiliations raises even more serious constitutional concerns.

Defendants assert that the current ballot layout process is supported by several legitimate State interests. First, the process is supported by the need for impartiality, which, defendants claim, is achieved through the alphabetization of the independent presi-

dential candidates by political party or organization, and the alphabetization of candidates for lesser office by last name. Second, the process is necessitated by the physical limitations of the ballot machines, the need to create a manageable ballot, and the need to avoid voter confusion. Finally, defendants argue, because of the national import of a presidential election, the State is justified in treating independent presidential candidates differently from independent candidates for lesser state offices.

I sympathize with defendants as to the logistical difficulties inherent in organizing hundreds of crowded State ballots. I do not believe, however, that under either the *Anderson* balancing test or traditional strict scrutiny the State's interests justify the serious burden imposed on plaintiffs' First Amendment rights by listing them in a column headed in bold with the name of a completely unaffiliated independent presidential party or political organization. Moreover, defendants' argument is severely undercut by the their voluntary agreement with the American Civil Liberties Union to place stickers over the offending column headings before the matter was ever heard in this Court.

In sum, I find that Rhode Island's practice in presidential election years of placing independent candidates for state offices underneath bold column headings identifying presidential political parties or principles wholly unrelated to those candidates, violates the First and Fourteenth Amendments.[18] The defendants are hereby permanently enjoined from utilizing this configuration in future statewide elections.[19]

## B. Additional Relief

While the Court has found a constitutional violation, it is not immediately apparent whether any additional relief is available to plaintiffs. The situation is unusual for several reasons. First, this Court has already granted plaintiffs pre-election equitable relief in the form of the Court's October 30, 1992 Order. Second, the actual ballot, as configured on election day with stickers marked "INDEPENDENT" placed over the offending column headings, complied with the constitutional principles outlined above. Finally, without the aid of experienced trial counsel, plaintiffs have failed to generate the factual record necessary for the Court to order further injunctive relief.

### 1. The Motion to Set Aside the Election

■ Though the federal courts have power under the constitution to intervene to invalidate a state election, such power is "[d]rastic, if not staggering ... and therefore a form of relief to be guardedly exercised." *Bell v. Southwell*, 376 F.2d 659, 662 (5th Cir.1967).

In the leading case in the First Circuit, *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), the plaintiffs challenged the results of a closely contested local primary after Rhode Island election officials and the Rhode Island Supreme Court retroactively invalidated 123 absentee and shut-in ballots that had been distributed to voters.[20] Before invalidation of the absentee and shut-in ballots, plaintiff Griffin had commanded a plurality of 15 votes and been certified as the winner by the Board of Canvassers. At the district level, this Court found that the rights of voters voting by absentee and shut-in ballot to vote in the primary election on an evenhanded basis together with other qualified voters had been violated. *Griffin v. Burns*, 431 F.Supp. 1361, 1366 (D.R.I.1977). This Court further found that because the invalidations had directly affected the outcome of the election, the most appropriate remedy was to invali-

---

**18.** While the *Dart* and *Rosen* courts addressed equal protection issues as well as the First Amendment, I base my decision solely on the First Amendment.

**19.** I do not intend my holding today to imply that this or any other federal court should inject itself into the routine· procedures and governance of state and local elections. I hold simply that Rhode Island's current procedures, as codified in the "GUIDELINES FOR BALLOT LAYOUT" fail

to safeguard adequately the constitutional rights of independent candidates and their supporters.

**20.** The Rhode Island Supreme Court had held that although the absentee and shut-in ballots had been distributed in accordance with past practice, there was no statutory basis for the casting of such ballots in a primary election. *See McCormick v. State Board of Elections*, 119 R.I. 384, 378 A.2d 1061 (1977).

date the primary, postpone the general election, and schedule a new primary and election in which the ground rules were clear. *Id.* at 1367–68. The First Circuit affirmed and approved this Court's use of the so-called "outcome" test as "a sensible guideline for determining when federal judicial invalidation of an election might be warranted ..." *Griffin,* 570 F.2d at 1080 (citations omitted). It cautioned, however, that the test "is not a principle requiring mathematical certainty." *Id.*

■ In my view, the record before the Court in this case does not provide the kind of specific evidence necessary for the Court to find, as a matter of fact, that the confusion surrounding the official Sample Ballots and the actual ballots affected the outcome of the election. *See Griffin,* 431 F.Supp. at 1368 ("The Court has found as a fact that the absentee and shut-in votes determined the outcome of the [election]."). Plaintiffs did provide ample individual testimony as to the confusion on election day and as to defendants' alleged non-compliance with the Court's October 30, 1992 Order. But they presented no hard data, no reputable polling figures, and no expert testimony concerning the likelihood that such confusion or non-compliance directly affected the outcome of the general election or their ability to obtain 5% of the gubernatorial vote. Thus, on the record presented, I decline to overturn the 1992 general election.

### 2. Motion to Recognize Reform '92 as a New Party

Plaintiffs' oral motion for an Order recognizing them as a third-party in Rhode Island presents a novel issue of law in this circuit. The Court's research has uncovered no cases in which a court overturned the results of an election with respect to party recognition. Ultimately, the motion must be denied for the same reasons that defeat the motion to set aside the election. The factual record, as developed by these *pro se* litigants, simply does not support a finding that *but for* the defendants' actions, plaintiff Devine would have received 5% of the popular vote.

### C. The Contempt Motion

■ Plaintiffs argue that defendants' noncompliance with the October 30, 1992 Order should result in a finding of civil contempt. The First Circuit employs a "substantial compliance" standard to evaluate civil contempt. *See Morales–Feliciano v. Parole Board of Puerto Rico,* 887 F.2d 1, 4–5 (1st Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). Substantiality of compliance, however, "depends upon 'the nature of the interest at stake and the degree to which noncompliance affects that interest.'" *Id.* (quoting *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare,* 692 F.2d 790, 795 (1st Cir.1982)).

"To establish civil contempt, a complainant must show by clear and convincing evidence that a specific order of the Court has been violated." *Palmigiano v. DiPrete,* 700 F.Supp. 1180, 1191 (D.R.I.1988) (citing *AMF Inc. v. Jewett,* 711 F.2d 1096, 1100 (1st Cir. 1983) and *Burke v. Guiney,* 700 F.2d 767, 769 (1st Cir.1983)). A court order must "be specific about what is to be done or avoided" and "[f]or a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion." *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 17 (1st Cir.1991).

"Good faith" efforts do not automatically constitute a sufficient legal excuse for failing to carry out [a] district court's order. *Fortin,* 692 F.2d at 796–97 ("Good faith is not a defense to civil contempt, .... [I]mpossibility would be a defense to contempt, ... [but] the test of impossibility may be particularly strict [where] the needs of [the plaintiffs] are urgent.") (citations omitted). *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) ("[t]he absence of willfulness does not relieve from civil contempt"); *see also United States v. Bryan,* 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) (contemnor can defend against contempt charges "by proving that he is unable to comply").

Defendants argue that they substantially complied with the Court's October 30, 1992 Order by printing the sample ballots and

disclaimers and distributing them to the various boards of canvassers. Defendants did not present a single witness, however, to rebut the testimony of plaintiffs' witnesses that the sample ballots were not being handed out at many locations and that many wardens had no inkling as to the purpose of the hand-outs. While several of plaintiffs' witnesses admitted they received the sample ballot and disclaimer, most stated that no one explained to them the meaning of the items.

Nor did the State rebut the testimony of plaintiffs witnesses that the sample ballot, as printed on 8½ by 14 inch paper, contained print that was illegible to the average reader. Defendants argue, however, that given the unavailability of a larger paper size and the plaintiffs' insistence that the ballot be reproduced for each and every district, including all local races and ballot questions, the print could not have been larger. I do not doubt defendants' sincerity. Yet, I find it incredible that the State would proceed to reproduce in excess of 500,000 illegible sample ballots, at substantial expense to taxpayers, without even consulting the Court, or the plaintiffs, or considering the use of an out-of-state printer to accomplish the task.

In the end, however, the record reveals that defendants made substantial efforts to comply with the Order. There was ample testimony to the effect that defendants immediately retained a printer to do the work, that the ballots were reproduced, that paper availability limited the choice of paper size, that a courier delivered the boxes of materials to the boards of canvassers, and that an explicit instruction sheet was drafted and circulated with the boxes of court-ordered materials.

Finally, due to the emergency nature of the situation and the attendant time constraints, the Court's Order was not explicit as to all the details necessary for compliance, such as paper size, the specific people responsible for carrying out the Order, and the means by which defendants were to communicate the purpose of the sample ballots and disclaimers to the thousands of local poll workers ultimately responsible for distributing them. Although, I find, as a matter of fact, that substantial numbers of voters did not receive the corrected sample ballots and disclaimers, defendants have demonstrated that they took substantial steps, in good faith, to comply with the Order.

## D. Motion to Amend the Complaint

Finally, plaintiffs have moved to amend their complaint to challenge the constitutionality of a large chunk of the Rhode Island election code. Federal Rule of Civil Procedure 15(a) provides that amendments to a pleading may be made as a matter of course prior to service of a responsive pleading or within twenty days of initial service of the pleading, but after that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." While such amendments shall be given freely "when justice so requires," the decision to grant or deny a motion to amend lies within the discretion of the district court. *Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 4 (1st Cir.1983) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

I sympathize with plaintiffs' desire to vindicate the rights of all present and future independent candidates by challenging the constitutionality of state laws that appear to disadvantage them. But the current posture of this case requires a denial of their motion. Since its inception, the case has focused exclusively on the 1992 ballot lay-out process and the distribution of the official Sample Ballots. Extensive testimony has already been heard on these issues. In my view, the injection at this time of a panoply of additional constitutional questions would unduly prejudice the defendants. The motion is DENIED.

## III. CONCLUSION

The writing of this opinion brings closure to a most unfortunate series of events in Rhode Island election administration. While there has been no evidence of willful wrongdoing on the part of defendants, the configuration, printing and distribution of the Sample Ballots at issue here failed to safeguard the rights of the voters in this State. Nevertheless, I decline to overturn or modify the results of the November 1992 statewide elec-

tion and decline to hold defendants in contempt of Court.

I cannot overemphasize, however, the importance of the constitutional rights at stake in this case. I commend the plaintiffs for their fervent belief in the constitutional principles so deeply rooted in our democracy, and for their willingness to devote their time and energy to defending them. There is no purer duty of a federal judge than to hear the petitions of the citizenry, in open court, and to safeguard those constitutional principles which ensure dynamic political debate and, above all, a fair political process.

SO ORDERED.

## APPENDIX A

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

JOSEPH F. DEVINE ET AL.

V.

STATE OF RHODE ISLAND ET AL.

C.A. No. 92–0580–P

MEMORANDUM AND ORDER

PETTINE, J., Senior District Judge.

■ This case involves a request for equitable relief made by various candidates, citizens groups and voters in Rhode Island. Earlier this month, the Office of the Secretary of State mailed out approximately 438,000 copies of a voter information booklet containing sample ballots which plaintiffs claim misrepresent the affiliations of many candidates. After negotiating with the Secretary of State, the parties agreed to alter the configuration of the ballots as they would appear on election day, and sent out notice by means of letter and newspapers as to the problem and the changes. Because of a discrepancy between the number of voter information books mailed and the probable success of the attempted notice of changes to voters through mail and newspapers, the plaintiffs now seek further relief from this Court in order to cure the likely confusion of

voters attempting to cast their ballots on election day.

Having found a serious likelihood of confusion to voters engendered by the discrepancy between the information booklet and the attempted notice, I believe that certain equitable relief is warranted.

I note first that restrictions upon access of political parties to the ballot clearly impinge upon the associational rights of political parties and voters. These associational rights, however, the Supreme Court has stated, "are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *Munro v. Soc. Workers Party*, [479 U.S. 189, 192–96], 107 S.Ct. 533, 536–37 [93 L.Ed.2d 499]. In this case, the plaintiffs challenge not the regulation of ballot access, but the configuration of the ballot itself, on the grounds that it does not adequately represent the correct affiliations of certain candidates. I further note that the situation does not present the problem where a candidate has been denied any access to the ballot.

Next, I note that merely placing a candidate's name such that it appears to be associated with another candidate, does not, without question deny that candidate's associational rights. *See Dart* at 1498. In *Dart*, the court noted that the Supreme Court precedent in this area almost uniquely involves situations where access to the ballot was denied. With respect to organization, however, the states have some leeway to formulate the presentation and configuration of the ballot itself. I note that the case at bar involves such a configuration issue.

Even though plaintiffs claim serious defects in the configuration of the current ballot, this court holds, on the facts presently before it, that such defects do not warrant the enjoining of the election. The motion requesting such action is hereby denied.

Plaintiffs have also raised serious issues, however, impinging upon the associational rights of voters with respect to the current ballot, and therefore with respect to the fairness of the election. As a result, notwithstanding the Court's refusal to enjoin the election, there remains the question of

whether or not certain equitable relief may be granted.

I do not necessarily find that a fundamental right has been abridged. Nevertheless, "the right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harmon v. Forssenius,* 380 U.S. 528, 537 [85 S.Ct. 1177, 1183, 14 L.Ed.2d 50] (1965).

In this case, the ballot information booklet as printed and replicated and mailed to over 438,000 households in Rhode Island, inherently creates such confusion as to restrict the voters' right to vote freely for the candidate of their choice. As a result, this Court must fashion a remedy. Because of the extreme time-pressure involved (60 minutes to draft and type this opinion!), I will not reiterate all of the arguments put forth by the parties as to the appropriate remedy. It is all in the record. It suffices to say that the Court agrees with the proposal put forth by counselor Arlene Violet on behalf of her clients. She proposes (1) that the state reproduce copies of the true ballot in each district and distribute such copies at each polling place, and (2) that the state distribute, together with the ballot copy, a disclaimer.

I must note Chairman DiStephano's position on behalf of the Board of Elections. Laudably, he has emphasized his willingness to cooperate and his desire to eliminate the possibility of any confusion that voters may have. To this end, he does not object to the distribution of sample ballots as the plaintiffs propose. However, he does object to the distribution of any disclaimer which refers explicitly to the headings on the ballot labeled "Independent." It is his position that such a disclaimer would unfairly prejudice other candidates due to the voters being directed at the very last moment to the independent columns. With due respect, I believe that the proposed clarification by disclaimer would have only de minimus, if any, effect upon voters. In light of the substantial possibility of voter confusion, this is a minimal risk, and one compelled by the facts at hand.

Finally, I note that counsel for the State have conceded that the relief I am ordering can be accomplished in the time remaining before the election. Nor were any arguments raised suggesting that the task would be unduly burdensome or prohibitively costly.

Therefore, for the forgoing reasons,[1] this Court ORDERS,

(1) That the Secretary of State reproduce copies of the true ballot for each district and distribute such copies at each polling place, together with

(2) a second piece of paper with the following disclaimer printed thereon:

* *ATTENTION* *

## TO ALL RHODE ISLAND VOTERS IN THE NOVEMBER 3RD GENERAL ELECTION

Please be advised that all candidates listed in columns under the heading INDEPENDENT have an individually designated affiliation listed above their name in (parenthesis).

These candidates are not affiliated with the presidential candidate at the top of their column.

Please refer to the accompanying sample ballot.

SO ORDERED.

/s/Raymond J. Pettine

RAYMOND J. PETTINE

Senior District Judge

October 30, 1992

---

1. This Order finds that the criteria for injunctive relief have been met: (a) Plaintiffs have demonstrated irreparable harm to the voters of this State, as against the inconvenience and expense to the State; and (b) Plaintiffs have demonstrated a likelihood of success on the merits. *See Reynolds v. Sims* [377 U.S. 533], 84 S.Ct. 1362 [12 L.Ed.2d 506] (1964).

**APPENDIX B**

# State of Rhode Island and Providence Plantations

## Sample Ballot

## Congressional District 1

## November 3, 1992

**YES! YOU MAY TAKE THIS SAMPLE BALLOT INTO THE VOTING BOOTH!**

# State of Rhode Island and Providence Plantations

## Sample Ballot

## Congressional District 2

## November 3, 1992

YES! YOU MAY TAKE THIS SAMPLE BALLOT INTO THE VOTING BOOTH!

## APPENDIX C

*GUIDELINES FOR BALLOT LAYOUT*

*PRIMARY:*

1. Candidates go in the following order:

U.S. Senate (if any)

U.S. Congress

Governor

Lieutenant Governor

Secretary of State

Attorney General

General Treasurer

Senator in General Assembly

Representative in General Assembly

Local Races *

Senatorial District Committees **

Representative District Committees **

State Committee **

Town Committees and Ward Committees

The Board of Elections needs to see how many candidates are running for the different offices when it gets to be 10 or more. The machines have a hard time with a lot of candidates (as in a city/town committee).

If it says "vote for any 7" you MUST leave 7 rows in order for the machines to be "comped" properly. Even if you only have 6 candidates, you have to leave the extra row.

Party candidates are listed alphabetically. Endorsed goes vertically, and unendorsed goes horizontally.

In any primary or election where there are races for council and/or school committee at large (not by district or ward) these must be staggered so that no more than one name appears on the same horizontal line—EX-CEPT for the non-partisan elections in Newport, Pawtucket and Woonsocket. These three cities may have them on the same line.

State questions are numbered on the ballot (i.e., Nos. 1 through 9) and then local questions continue with the next number (i.e., Nos. 10 through 15).

Local candidates' placement may be dictated by their home rule charter. Check this and verify with the local board. Some boards pull by lot.

*ELECTION*

Questions must either have "yes" or "no" or "approve" or "reject". If the local board does not specify, use "approve" or "reject". (North Kingstown is historically the one community that uses "yes" or "no".) State questions are ALWAYS "approve" or "reject". Local questions are highlighted on the ballot.

State candidates are listed with the Democrats and Republicans in the first two columns. This is dictated by the party of the present Secretary of State as to who is in the first column. Independent candidates are listed alphabetically starting in the 3rd column, and continuing on horizontally.***

You must have at the top of the column over the name of the political party whose candidates appear in the column, the emblem of the political party. (Democrat—Star; Republican—Eagle) (See 17–1–2(f) for definition of political party). (see 17–19–9).

Party levers must only be used in the election for political parties. (see 17–19–15).

Mail ballots for the general election must have a column for write-ins (see 1992 for example).

---

* For Local races, the local board of canvassers certifies the order of the ballot. DON'T JUST FOLLOW THAT—check last year's ballot and if the order is different, call the local board to confirm.

** These offices follow any local office on the ballot. They must be in the same row all through their district. For example. In Warwick, if a Senatorial District Committee started on line 14 in Ward 2 (following a Mayor, Council at Large and a District Council Seat), and the same Senate District is also in Ward 3, but Ward 3 does not have a district council race, you would skip that row and make sure that the Senatorial District Committee started on line 14 in this ward also. This is so that if a candidate is running for a seat, they have the same ballot placement through all of their district.

*** In a presidential year, the names of the independent presidential parties are listed alphabetically across the top.

**APPENDIX D**

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

BOARD OF ELECTIONS
50 Branch Avenue
Providence, R.I. 02904
401-277-2345

TO: BI-PARTISAN SUPERVISORS AND WARDENS

DATE: NOVEMBER 3, 1992

RE: 2-PAGE NOTICE TO BE GIVEN TO EVERY VOTER

ENCLOSED IN THIS PACKET IS A NOTICE MADE UP OF 2 SEPARATE PAGES WHICH **MUST** BE HANDED TO EACH VOTER AS FOLLOWS:

THE BI-PARTISAN SUPERVISORS **MUST** GIVE THE VOTER EACH OF THESE 2 PAGES AS SOON AS THE VOTER COMES TO THE TABLE AND STATES HIS OR HER NAME.

IMPORTANT !!! EACH AND EVERY VOTER **MUST** BE HANDED A COPY OF THE 2-PAGE NOTICE - YOU CAN **NOT** JUST LEAVE THEM ON THE TABLE FOR VOTERS TO PICK UP.